THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH WHEATLEY, Defendant-Appellant.

First District (5th Division)   No. 1—87—0044

Opinion filed May 12, 1989.

PINCHAM, J., specially concurring.

Michael J. Pelletier, Karen Michels, and Kenneth L. Jones, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago, (Inge Fryklund, Peter T. Petrakis and Andrea K. Muchin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant Kenneth Wheatley was convicted of armed robbery and sentenced to six years' imprisonment. On appeal, defendant contends: (1) he was not proved guilty beyond a reasonable doubt because the complaining witness' identification of him was inadequate and unreliable and a lineup from which the witness identified him was the product of suggestive procedure; (2) he was denied a fair trial because a number of comments by the State during closing and rebuttal arguments were not based on the evidence or were made as a personal attack on the integrity of defense counsel; and (3) the trial court erred in refusing to give his tendered instruction on identification to the jury. For the reasons set forth below, we affirm.

Defendant and his brother, Robert Wheatley, were initially charged with armed robbery, armed violence and unlawful use of weapons in connection with the October 9, 1985, robbery of complainant, Richard Gillis (Gillis). Defendant elected to be tried by a jury and Robert elected to be tried simultaneously by the court. Prior to jury selection, the State moved to strike the unlawful use of weapons charge against defendant and *nolle prossed* the armed violence count. Defendant subsequently filed pretrial motions challenging the legality of his arrest and the propriety of the lineup which he claimed was conducted in a suggestive manner. Both motions were denied.

At trial, the evidence disclosed that Gillis left his Chicago Loop law office at 10:15 p.m. on October 9, then took an el train to Fullerton Avenue and then, while walking north on Sheffield toward his home on Wrightwood, he saw two black males standing on each side of the sidewalk (both sides of the street were lit by streetlights). One

man who was wearing a brown jacket approached him; the man was about 5 feet 9 inches and weighed approximately 150 pounds. At a distance of two feet, the man asked Gillis if he knew the location of a particular address. Upon looking at the man's face, Gillis noticed that he had a slight mustache and a beard. Gillis did not answer and instead began to walk around the man to his left. The man also moved to the left, outflanking Gillis. He pulled out a chrome-colored gun and told Gillis, "Give us your money [expletive]," and Gillis responded, "Alright, I'll give you my money." The man then told Gillis to "Get into the alley," Gillis stated he would give the man his money "right here," and the man again told Gillis to get into the alley. At that point, the second man, who had been standing behind Gillis, pulled him into the alley. The alley was 15 to 20 feet wide with a light 25 feet from the door of a building and 15 feet from the surface. The man directed Gillis to a door leading to a building off the alley and they pushed him through the doorway into a vestibule area with a stairway off to the right leading to the basement. The vestibule area had one bare lightbulb overhead and light was coming in through the glass in a door that led to another part of the building. At that point the other man, who had a blue or black steel revolver with a rubber band on the barrel, started going through Gillis' pockets, which contained paper, pens and $17 in cash. The other man subsequently told Gillis, "You got some money. I know you got more money." Gillis responded that he did and took an envelope from his boot. The envelope contained $140, a $35 check, and a deposit slip from the Lakeview Trust and Savings Bank. Thereafter, Gillis was told to go downstairs and not to come out for 5 to 10 minutes. However, after a minute or so, he came upstairs, looked around, saw that no one was there, and went home and immediately called the police. The time was approximately 10:45 p.m.; the robbery had taken about five minutes.

Around midnight, Gillis received a call from the police, who told him they had recovered his bank deposit slip and some cash. Gillis went to the police station and viewed a lineup of six men; Robert Wheatley, defendant's brother, was in the first position, Ted McLeod was in the third position, Vincent Wheatley, defendant's brother, was in the fifth position, and defendant was in the sixth position. Gillis identified defendant as one of the men who had robbed him. Gillis acknowledged the fact that the person he identified in the lineup was not wearing a brown jacket and blue jeans like the man he described as one of the robbers, but rather a black leather jacket and grey pants.

Police officer Sergio Rajkovich testified that on October 9, 1985,

at approximately 11:20 p.m., he and his partner, Officer Reno Baiocchi, were in a squad car traveling east on Armitage Avenue when they observed a Pontiac without a license plate also going east on Armitage. After the Pontiac made a left turn on Halsted Street, the officers curbed it. Four men were in the car: Robert Wheatley, the driver; Ted McLeod, the front seat passenger; defendant, who was in the rear seat behind McLeod; and Vincent Wheatley, who was behind the driver. The officers got out of their car, and Officer Baiocchi asked Robert Wheatley for his driver's license and was told he had none. Officer Rajkovich then approached the passenger side of the car and asked the other occupants if one of them had a license to drive the car because Robert was being arrested. Defendant responded that he had a license. As defendant exited the car, Officer Rajkovich, who had his flashlight pointing inside the car at defendant, saw a chrome-plated gun (a .357 magnum) on the seat where defendant had been sitting. He then ordered everyone out of the car and handcuffed them. In searching the rear seat of the car, Officer Rajkovich discovered a second gun (a blue .22 caliber steel revolver) where Vincent had been sitting, a brown jacket, and a black hat. In the front seat, Rajkovich found a Lakeview Bank deposit slip with Gillis' name, address and telephone number on it. At this point, Rajkovich placed the four men under arrest, advised them of their *Miranda* rights, and conducted a pat down search. After being advised of his rights, defendant admitted ownership of the chrome-plated .357 magnum handgun.

The police took the men to the 18th District police station where they were again searched. Sixty-one dollars (three-$20 bills and one-$1 bill) were recovered from Vincent and $40 (one-$20 bill, one-$10 bill, one-$5 bill and five $1 bills) from McLeod; Robert and Kenneth did not have any money on them. Officer Rajkovich prepared a booking sheet on each man. Defendant's sheet indicated that he was 21 years of age, weighed 145 pounds, was 5 feet 9 inches tall, and had brown eyes and black hair.

Officer Kevin Murphy testified on defendant's behalf that on October 9 he was assigned to investigate an armed robbery and he arrived at Gillis' home at approximately 10:55 p.m. Gillis subsequently described the two armed robbers as being "male blacks, in their early twenties, approximately 5 feet 9 inches and 150 pounds." Gillis further stated that the first man wore a brown jacket and jeans and the second wore a dark jacket and blue jeans. Gillis did not mention any facial characteristics of either offender.

Vincent Wheatley testified that on October 9 he was at his moth-

er's house on the southside of Chicago with Ted McLeod and his two brothers, Robert and defendant. When he learned they were going to deliver phone books on the northside, he asked if he could go along. The group took Vincent's car and made three stops, but only Robert and McLeod got out of the car to deliver the phone books; neither Vincent nor defendant ever exited the car. The third stop was at 950 Altgeld and Robert and McLeod returned from their delivery within three to five minutes. The group then was driving back to the southside when they were stopped by the police. While pulling over to the curb, McLeod handed Robert a gun and Robert handed two guns back to Vincent, telling him to "put the guns up." He then placed one gun behind himself and one behind defendant. Vincent further testified that he never heard defendant tell the police that he had a driver's license, that defendant in fact does not drive, nor did defendant make any other statements to the police. Vincent also described defendant as having reddish blonde hair and green eyes. He further stated that the brown coat found in the back seat of his car was put there by a female friend of his one week prior to October 9 and that defendant had never worn it.

Defendant testified on his own behalf, relating the identical version of the events leading up to the police stop as described by Vincent. He also stated that he never told the police he had a driver's license or that he told Officer Rajkovich and an assistant State's Attorney that the chrome-plated gun belonged to him. He described himself as having *"Brown,* I mean not brown, green eyes" and *sandy brown* hair, with two missing teeth in the front of his mouth. (Defense counsel "published [defendant] to the jury to demonstrate that [he] has *green* eyes and *reddish* hair and that he is missing two teeth from the front of his mouth.") (Emphasis added.) He further stated that on October 9 he was wearing white pants, a black T-shirt and a black leather jacket. On cross-examination, over defense counsel's objection, the State had defendant try on People's exhibit No. 7, the brown jacket. Thereafter, the prosecutor stated, "Record will reflect that jacket fits." Defense counsel objected and the court sustained the objection, directing the jury to disregard the comment.

During the jury instruction conference, the court refused to give defendant's tendered "non-IPI" instruction regarding the reliability of eyewitness identification. Following closing arguments, the jury deliberated and found defendant guilty of armed robbery for which the court sentenced him to six years' imprisonment. This appeal followed.

Defendant first argues that he was not proved guilty beyond a reasonable doubt. Specifically, he contends that his identification as

one of the robbers was insufficient to sustain his conviction because it was based on inadequate and unreliable observations by Gillis and a suggestive lineup identification. Defendant points out that Gillis told Officer Murphy that his assailants were 5 feet 11 inches, 150 pounds, with brown eyes and black hair as opposed to the fact that defendant is 5 feet 9 inches, had reddish brown hair and green eyes; that the man with the chrome-plated gun was wearing a brown jacket and blue jeans as opposed to the fact that defendant was wearing a black leather jacket and light-colored pants and it is unlikely defendant had an opportunity to change his clothes; and Gillis did not mention to Murphy any facial characteristics of the offender such as a slight mustache, beard and missing front teeth which in fact was defendant's appearance when he was arrested.

Defendant further contends that the lineup identification was tainted with suggestibility because prior to the lineup Gillis had been informed by the police that his property had been recovered from persons in a vehicle that had been stopped. Defendant also asserts that the lineup identification was unreliable in light of the fact that Gillis was fatigued after working a long day, the robbery only lasted five minutes during which it was raining and Gillis was wearing glasses, and the lighting conditions were questionable.

On the other hand, defendant argues that his alibi that he never exited the car that evening, as corroborated by his brother Vincent, outweighed Gillis' identification testimony. He further points out that Gillis' deposit slip was found on the floor in the front seat of the car at Robert's feet and proceeds from the robbery were found on McLeod, that Robert and McLeod had the weapons discovered in the car which they had passed back to Vincent to "put up," and that no fingerprint analysis connected him to the weapons. Hence, defendant contends that Robert and McLeod were "the most likely suspects." Lastly, defendant asserts that Officer Rajkovich's testimony that he stated he had a driver's license and that he admitted to owning the chrome-plated gun is "incredible."

■ ■ It is well established that a positive identification by a single witness is sufficient to sustain a conviction. Where a witness had a sufficient opportunity to view an accused, showed an adequate degree of attention to an assailant's characteristics, described the assailant with a reasonable degree of accuracy, displayed a sufficient amount of certainty in identifying his assailant and identified the accused within a reasonable period of time following the crime, an identification is considered positive and reliable. (*People v. Taylor* (1986), 143 Ill. App. 3d 252, 492 N.E.2d 1011.) The sufficiency, weight and

credibility of an identification witness' testimony is for the jury to determine. A reviewing court will not set aside a jury's verdict unless the evidence was so improbable as to raise a reasonable doubt as to a defendant's guilt. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

In the instant case, we do not find that the identification testimony was so doubtful, vague and uncertain as to be overcome by defendant's alibi that he never exited the car on the night of the robbery. (See *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232.) Gillis clearly had a sufficient opportunity to view defendant. When he initially encountered defendant, defendant was within one to two feet of an overhead streetlight and there was a corresponding light on the other side of the street. When defendant approached him holding a piece of paper, defendant was only two feet away from him and he could see defendant's face. When defendant pushed him into the alley, which was lit by a light over a building doorway, and subsequently through the doorway, defendant was in front of him so that he was looking directly at defendant. While defendant's accomplice went through his pockets for money, defendant continued to hold the chrome-plated gun on him in the vestibule area of the building, which was lit by a bare lightbulb and light coming from a doorway in an adjoining part of the building. During the five minutes in which the robbery occurred, therefore, Gillis had a continuing clear view of defendant.

Gillis also demonstrated an adequate degree of attention to defendant, describing him within a reasonable degree of accuracy. At trial, Gillis testified that he was robbed by a black male with black hair and brown eyes, 5 feet 9 inches, 150 pounds, with a slight mustache and beard growth, and wearing a brown jacket and jeans. The booking sheet prepared by Officer Rajkovich described defendant as 5 feet 9 inches, weighing 145 pounds, with black hair and brown eyes; a brown jacket was recovered from the Pontiac from the rear seat where defendant had been seated; and a chrome-plated gun, which Gillis had described, was also found on the rear seat where defendant had been seated.

We further observe, as apparently did the jury, that the discrepancies in Gillis' positive identification of defendant as one of the robbers weighed more heavily in Gillis' favor in light of the confusion expressed in the testimony of both parties' witnesses. For example, although defendant emphasized the fact that Officer Murphy's police report, as taken from Gillis, indicates defendant's height as 5 feet 11 inches, instead of 5 feet 9 inches as testified to by Gillis at trial, the

record discloses that on cross-examination the State kept referring to the height of the robbers as 5 feet 9 inches, which Murphy confirmed and, additionally, on redirect examination, defendant's own counsel referred to the height of the men as 5 feet 9 inches, which Murphy confirmed again. Similarly, we note that although Murphy's report indicated that the man carrying the chrome-colored gun was wearing blue jeans, Murphy also testified that he did not in fact recall whether Gillis had told him the man was wearing jeans or blue jeans and that he could have written this fact down inaccurately. (Adding to this confusion is the fact that defendant's pants were also described as gray, off-white and light-colored.) With respect to the discrepancies concerning defendant's eye and hair color and whether defendant's missing teeth were so prominent that Gillis should have noticed same, we note that at trial even defendant appeared uncertain about his own eye color; at first he stated his eyes were brown, then green and described his hair as sandy brown (while on appeal his brief describes his hair as reddish brown). Like Gillis' description of defendant, even Officer Rajkovich, who had a clear opportunity to view defendant when he arrested him, indicated in his booking report at the arrest scene that defendant's hair color was black and his eye color brown. We further note that the fact that Gillis allegedly did not mention the fact to Officer Murphy that defendant had a slight mustache and beard and did not otherwise notice that defendant had two front teeth missing were matters for the jurors to weigh in light of the foregoing when defense counsel published defendant to them; it was for them to resolve the conflicts in the evidence and the weight to be accorded the testimony. They apparently decided that Gillis' description of defendant was sufficiently accurate and we see no reason to disturb their determination.

We further observe that notwithstanding the fact that defendant was not wearing the brown jacket when arrested, the brown jacket *was found* in the rear seat of the car where defendant had been seated. In addition, the chrome-colored gun *was found* on the car seat where defendant had been sitting and Officer Rajkovich and an assistant State's Attorney testified that defendant had told them the gun was his.

In the same vein, Gillis showed a reasonable degree of accuracy in identifying defendant within a short time after the robbery. The robbery occurred at approximately 10:30 p.m., Gillis called the police at 10:45 p.m., and, at 1 a.m., Gillis viewed a lineup which included defendant. After 5 to 10 minutes, Gillis identified defendant, the sixth in position, as one of the robbers, notwithstanding the fact that

defendant was wearing a black leather jacket and light-colored pants, rather than the brown jacket and "jeans" which Gillis had described to Officer Murphy; apparently Gillis identified defendant based on his total impression of him, rather than on his clothes alone. (See *People v. Dean* (1987), 156 Ill. App. 3d 344, 351, 509 N.E.2d 618 (identifications are based upon the "total impression" of the witness rather than a single distinguishing feature); *People v. Ervine* (1965), 64 Ill. App. 2d 82, 87, 212 N.E.2d 346 ("[I]t is contrary to human experience to make an identification by noticing first the separate features, hair, or clothes of a person, and then, somehow, running off a total to determine recognition or non-recognition. Ordinarily all features are viewed at once and the recognition made instantaneously or not at all. This is one of the reasons why minor discrepancies in identification do not require reversal").) Most importantly, there is nothing in the record to suggest that Gillis was uncertain about his identification of defendant.

■ We next briefly note that the suggestibility of the lineup procedure was the subject of a motion to suppress filed by defendant prior to trial. The court denied the motion and defendant did not raise any issue as to the correctness of the court's ruling. In any event, however, we find no suggestibility based on the facts before us. Prior to viewing the lineup, the only communication of Gillis from the police was that they had recovered his bank deposit slip and some cash from "some persons" in a vehicle that they had stopped. Officers other than those who arrested defendant conducted the lineup, which was composed of six men, including defendant, Robert, Vincent and McLeod. Each man was instructed to step forward, turn and return to his position. Gillis positively identified defendant after 5 to 10 minutes; he did not identify Robert, Vincent or McLeod as the robber with the chrome-plated gun, who also were the victims of the allegedly suggestive lineup procedure. Defendant's further contention that Gillis was fatigued etc., and his lineup identification therefore unreliable, is pure speculation, and the lighting conditions, as discussed above, did in fact give Gillis a clear opportunity to view defendant. Based on these facts, and the factors in determining the reliability of Gillis' identification of defendant (opportunity to view, degree of attention and accuracy of the description, level of certainty, and the time between the crime and the confrontation), we, like the trial court, find no improper suggestibility influenced the lineup identification procedure.

■ In light of the foregoing, and since the weight to be accorded the credibility of the witnesses was for the jury, we hold that the evi-

dence was not so improbable as to raise a reasonable doubt of defendant's guilt.

Defendant's second argument is that he was denied a fair trial because of improper and prejudicial comments made by the State in its closing and rebuttal arguments, which were not based on the evidence or were made as a personal attack on the integrity of defense counsel. Specifically, defendant complains of nine comments, *i.e.*, two comments stating that the brown jacket "fit" defendant; a comment that defendant was wearing a brown jacket and jeans when in fact defendant was wearing a black leather jacket and light-colored pants; that "Richard Gillis knows armed robbers change their clothes"; that even though defendant said his "bottom" teeth were missing, "[t]here isn't a tooth missing"; the State's calling attention to the fact that defendant was nodding his head when Gillis was testifying that he would place defendant as standing in front of a lamp post depicted in a photograph taken at the scene of the first phase of the robbery; that defendant's fingerprints were not found on the chrome-plated gun because they were rubbed off the gun by cloth while the gun was positioned behind him; the State's comment that defense counsel was unethical and that defense counsel was trying to prevent an officer from testifying that the guns discovered by the police were the same size; and the State's "assertion" that two of its witnesses, a Chicago police officer and an assistant State's Attorney, were more credible than defendant. On the other hand, the State contends that defendant waived many of his arguments on the issue by not objecting to them at trial or in his post-trial motion and, alternatively, that no prejudice resulted to defendant since the complained-of comments were based on the evidence adduced at trial or were reasonable inferences therefrom.

■ Although alleged prejudicial remarks made by a prosecutor during closing argument generally will not be considered on appeal where a defendant failed to object to them at trial (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267), a reviewing court may consider them, in the interest of justice, under the plain error rule (107 Ill. 2d R. 615(a)). Defendant argues that the cumulative impact of the complained-of errors constitutes plain error requiring reversal of the jury's verdict. We disagree.

■■ ■ It is well settled that a prosecutor has great latitude in presenting closing argument. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.) A prosecutor has the right to comment on the evidence that has been adduced at trial and make all legitimate inferences therefrom. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d

315, 379 N.E.2d 847.) In determining the propriety of a closing argument, a reviewing court generally will follow the trial court's ruling absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) Where a prosecutor's comments are error, the comments do not automatically constitute reversible error since reversible error occurs only where the comments substantially prejudice a defendant. A defendant suffers substantial prejudice when the result of his trial would have been different had the improper comments not been made. *People v. Love* (1985), 139 Ill. App. 3d 104, 486 N.E.2d 1337.

■ With respect to the State's comments about the brown jacket fitting defendant, we observe that the trial court's sustaining of defendant's objection to this statement during trial was based apparently on the fact that the State was making a determination that was for the jury to make in observing defendant dressed in the jacket. The fact that the State repeated its opinion that the jacket fit defendant well during argument clearly would have been recognized by the jury as merely the State's opinion, based on *its* observation of defendant, and the jury was free to agree or disagree with the State. Moreover, any prejudice to defendant was cured by the court's instruction to the jury that if the State's argument was not based on the evidence the jury could disregard it. See *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804.

The prejudicial nature of the complained-of comment relative to defendant's clothing is unclear to us. Defendant possibly is suggesting that the comment incorrectly states that defendant was wearing a brown jacket and jeans *when he was arrested* rather than the black jacket and light-colored pants he was in fact wearing. However, our interpretation of the comment is that it is merely a reiteration of the testimony of Officer Murphy and Gillis that one of the robbers (defendant) was wearing a brown jacket and jeans. In any event, any prejudice attendant to this comment was cured by the court's instruction to the jury to disregard it if it was not based on the evidence. See *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804.

■ We also reject defendant's argument that the State improperly commented that "Richard Gillis [as an attorney] knows armed robbers change their clothes." This comment was invited by defense counsel, who stated during his closing argument that "Mr. Gillis *is an attorney*, certainly he knows the difference between blue jeans and off white pants." (Emphasis added.) In rebuttal the State was merely responding to this comment; defense counsel made an assumption supposedly based on Gillis' occupation and the State was properly en-

titled to make a similar assumption. See *People v. Perez* (1983), 113 Ill. App. 3d 143, 446 N.E.2d 1229 (comments by a prosecutor that are ordinarily considered prejudicial are proper in rebuttal argument when the comments are responses that are invited by defense counsel's closing argument).

■■■ We further find that any possible error that arose from the State's comment on defendant's missing teeth was merely a mistaken belief of what evidence had been presented and was therefore harmless. The State commented that "he [defendant] says, my bottom teeth are missing. There isn't a tooth missing." A review of the record indicates that defendant testified he was missing two front teeth, but it does not indicate whether they were upper or lower. Accordingly, the State's comment apparently was based on its possibly mistaken interpretation of the evidence, and the court's instruction to the jurors to disregard it and to consider only the evidence cured any error (see *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804), notwithstanding that the State made an additional comment after the court's instruction. Moreover, the jurors had viewed defendant individually with his mouth open for the purpose of determining whether his missing teeth were so prominent that Gillis should have noticed same and, therefore, defendant could not have been prejudiced in any way.

We also find without merit defendant's contention that the prosecutor improperly commented during closing argument that defendant was nodding his head during a portion of Gillis' testimony concerning the position of defendant under a lamp post when defendant first confronted him. Defendant does not cite to any authority in support of his argument or make the argument with specificity; he merely states that the comment was not based on the evidence. In any event, since defendant objected to this comment and the trial court promptly sustained the objection and instructed the jury to disregard the comment if not based on the evidence, any prejudice was cured. See *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

■■■ We also agree with the State that its comment, that "in real life when you're sitting on a gun in the back seat [of a car] and its cloth is rubbing things off you're not going to find any fingerprints," was invited by defense counsel. Specifically, defense counsel argued to the jury that the State had "an obligation to take a hand print analysis of the [chrome-plated] gun." The State was merely responding to this comment by reasonable inference and its response was based on the evidence that defendant had stated he owned the gun and it had been pushed between the seat behind him. We further observe that

unlike the situation in *People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280, upon which defendant relies in support of his argument, the prosecutor in the instant case never accused defendant of wiping his fingerprints off the gun in order to exculpate himself.

▪ Similarly, we find no merit in defendant's argument that the State undermined defense counsel's integrity. Clearly, the State's comments were invited. Defense counsel implied to the jury that the State prevented it from hearing evidence, *i.e.*:

> "Each time I attempted to get responses from Officer Murphy relative to what he wrote in his report, objection once [sustained], objection twice [sustained], objection three times [sustained]. *Why don't* [*sic*] *the State want you to know what Officer Murphy wrote in his report.* And even suggested that what was in his report was not told to him by Mr. Gillis the State would have you just to take it and discard it." (Emphasis added.)

The State's properly invited response to defense counsel's comments was a reiteration of defense counsel's comments and its own comment that "What does sustained mean? Counsel, it's improper, you know it's improper, you are a lawyer that is an unethical, improper thing to do. Sustained. He's doing something improper and all of a sudden now he wants to say the State doesn't want you to hear the evidence. That is garbage, that type of defense ploy is garbage." We also reject defendant's assertion that the State implied that defense counsel was trying to prevent an officer from testifying that the guns discovered by the police were the same size. We find it unnecessary to address this contention since defendant has failed to argue it with specificity.

▪ Defendant's last argument on this issue is that the State improperly claimed that two of its witnesses were more credible than defendant because one was a police officer and another an assistant State's Attorney. Like many of the previously discussed comments, defense counsel invited the State's response. Specifically, defense counsel told the jury that Officer Rajkovich lied to them twice and that his credibility was "worthless, and unworthy of *** belief." In response, the State more or less asked the jury to use common sense; *i.e.*, "Now the police officer is going to make that statement up [that defendant admitted to owning the chrome-plated gun]? I'll tell you if he is going to make something up, *** he's going to put the whole quarter on this guy—He's going to come up with more than it's just my gun." Similarly, defense counsel emphasized the assistant State's Attorney's status and suggested that she, who also testified that defendant admitted to owning the gun, was lying in order to support

Officer Rajkovich's similar testimony. In response, the State merely remarked that "and a professional assistant State's attorney, she's going to risk her law career, everything to make up that this guy made a statement." Clearly, the State was not asserting that these two witnesses should be considered more credible than defendant's witnesses based on their occupations, but merely that they would not lie.

Based on the foregoing, we therefore hold that the complained-of comments by the State, if error, were either harmless and cured by the trial court's instructions to the jury to disregard them if they were not based on the evidence or they were invited by defense counsel and therefore proper.

The final issue raised by defendant concerns the refusal of his tendered instruction on identification. The tendered instruction, tailored to meet defendant's theory that Gillis' identification of him was mistaken, stated:

> "The reliability of eyewitness identification has been raised as an issue in this case and deserves your attention. Identification testimony is an expression of belief or impression by the witness. Its value depends upon the opportunity the witness had to observe the offender at the time of the offense and later to make a reliable identification, and upon the influences and circumstances under which the witness made the identification.
>
> You must consider the credibility of each identification witness in the same way as any other witness. Consider whether he is truthful and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony.
>
> The State has the burden of proving beyond a reasonable doubt that the defendant was the person who committed the crime."

The State tendered Illinois Pattern Jury Instructions (IPI) on the witness' credibility and on the prosecution's burden of proof, Nos. 1.02 and 2.03 (IPI Criminal, Nos. 1.02, 2.03 (2d ed. 1981) (hereinafter IPI Criminal 2d)). IPI Criminal 2d No. 1.02 states:

> "You are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

IPI Criminal 2d No. 2.03 states:

"The defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

The trial court, in refusing defendant's tendered instruction, stated that IPI Criminal 2d Nos. 1.02 and 2.03 sufficiently covered the contents of defendant's proposed instruction. Defendant, however, in arguing that his instruction should have been given to the jury, relies on the committee comments of IPI Criminal 2d No. 1.02, where it was recommended as follows:

"While this instruction contains most of the usual elements of believability, the Committee recognizes that the evidence in a particular case could call for the insertion of additional elements. For example, in a case involving eyewitness identification, the trial judge *may* add factors such as the witness's opportunity to view the offender at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of the witness's earlier description of the offender, the level of certainty shown by the witness when confronting the defendant, and the length of time between the offense and the confrontation." (Emphasis added.) IPI Criminal 2d No. 1.02 (1987 Supp.), Committee Notes, at 3.

We first observe that the foregoing recommendation not surprisingly states that a trial court *may* allow the insertion of additional factors in a jury instruction where the case involves an eyewitness identification. This follows from the fact that the decision to give a non-IPI instruction is within the sound discretion of the trial court. (*People v. Robinson* (1979), 75 Ill. App. 3d 112, 394 N.E.2d 13.) We further note that Illinois courts have rejected the giving of a separate instruction for identification, holding that IPI Criminal 2d No. 1.02 (witness credibility) and IPI Criminal 2d No. 2.03 (burden of proof) sufficiently instruct the jury on the issue of misidentification. (*People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720; *People v. Benson* (1979), 71 Ill. App. 3d 591, 390 N.E.2d 113; *People v. Griswold* (1977), 54 Ill. App. 3d 246, 369 N.E.2d 392.) Our courts also follow the concept of avoidance of the giving of duplicative instructions. (*People v. Perkins*

(1977), 47 Ill. App. 3d 548, 362 N.E.2d 109.) Finally, it has been held not to be error in a criminal case to refuse an instruction which accurately states the law applicable to a case if that principle has been correctly and sufficiently stated by another instruction. *People v. Walker* (1988), 177 Ill. App. 3d 743, 532 N.E.2d 447.

■■ In the instant case, the trial court submitted both IPI Criminal 2d Nos. 1.02 and 2.03 to the jury and, therefore, the jury was sufficiently instructed on the issue of identification. Accordingly, the court's refusal to give defendant's separate instruction on identification was not error.

For the reasons stated, we therefore affirm the judgment of the circuit court of Cook County.

Affirmed.

COCCIA, J., concurs.

JUSTICE PINCHAM, specially concurring:

Illinois Pattern Criminal Jury Instruction, Criminal, No. 1.02 (2d ed. 1981) (hereinafter IPI Criminal 2d) is on the credibility of witness. IPI Criminal 2d No. 2.03 is on the defendant's presumption of innocence and the State's burden of proof. Neither instruction is on eyewitness identification, although the portion of instruction No. 1.02 that, "In considering the testimony of any witness, you may take into account his ability and opportunity to observe," is obviously applicable to an identification witness, as it is to a nonidentification or any other witness.

The instruction on eyewitness identification tendered by the defendant, refused by the trial court, and set forth in the court's opinion is No. 3.06 from Federal Criminal Jury Instructions. In rejecting it, the trial court stated:

"The court considers that IPI 1.02 as an issue on credibility and it does provide that 'in considering the testimony and any witness you may take into account his ability and opportunity to observe, his memory and manner while testifying.' et cetera. And the court considers that IPI instruction [1.02] is sufficient, broad and exclusive to cover the contents of this proposed instruction. The proposed instruction will not be given."

IPI Criminal 2d No. 1.02, which the court gave, did not cover the four following additional elements of identification: (1) the witness' degree of attention at the time of the offense; (2) the accuracy of the witness' earlier description of the offender; (3) the level of certainty

shown by the witness; and (4) the length of time between the witness' observations of the offender during the commission of the offense and the witness' later identification of the offender. The committee comments to IPI Criminal 2d No. 1.02 expressly "recognize[ ] that the evidence in a particular case could call for the insertion of [these aforestated] additional elements" in an identification instruction.

The case at bar was clearly such a "particular case." IPI Criminal 2d No. 1.02 failed to cover the complete elements that are required to be considered in assessing identification testimony, and it was therefore inadequate. It did not, even in conjunction with IPI Criminal 2d No. 2.03, advise the jury on the circumstances it should consider in evaluating identification evidence and they therefore were not duplicitous. Nor did IPI Criminal 2d Nos. 1.02 and 2.03 sufficiently instruct the jury on the issue of the victim's identification of the defendant as the offender. The defendant's proposed instruction was therefore improperly refused and the trial court erred in refusing it.

In this case, however, in view of the totality of the evidence, particularly, but not limited to, the victim's observations of the robbers during the commission of the offense, the victim's prompt reporting of the offense and description of the robbers and their weapons to the police, the defendant's arrest shortly after the robbery, the discovery of the weapon described by the victim practically in the defendant's possession and the defendant's admission that the weapon belonged to him, the discovery of another weapon described by the victim and the victim's property that was taken in the robbery in the car in which the defendant was arrested, the victim's identification of the defendant as the robber shortly after the robbery, and the victim's careful scrutiny of the lineups to be certain of his identification of the defendant as the robber, I unreluctantly conclude that the error was harmless.

In *People v. Moore* (1983), 95 Ill. 2d 404, the supreme court held that the trial court's refusal to give the defendant's tendered instruction on voluntary manslaughter was harmless error because the evidence overwhelmingly established that the defendant was guilty of felony murder and, thus, it made no difference if the homicide was committed by the defendant under the unreasonable belief that the homicide was in self-defense and therefore justified. Similarly, the supreme court in *People v. Jones* (1979), 81 Ill. 2d 1, held that where the intent to kill was "blatantly evident," the trial court's improper failure to correctly instruct the jury on the defendant's mental state, *i.e.*, his intent to kill in attempt murder, was harmless error.

It is only because of the unique facts in the case at bar that the

trial court's erroneous refusal to instruct the jury on the aforementioned additional elements of identification was harmless. On the facts in the case at bar it can be concluded with reasonable certainty that the jury's guilty verdict would have been the same had it been properly instructed on the aforestated omitted elements on identification.

Similarly, the court held that the "defendant suffered no prejudice by the court's refusal of his [identification] instruction" in *People v. Benson* (1979), 71 Ill. App. 3d 591, 595, 390 N.E.2d 113, cited in the court's opinion in the case at bar. In *Benson*, the restaurant owner robbery victim gave the officers descriptions of the three robbery offenders and told the officers that the name of one of them was Rufus, who had previously worked for him in his restaurant, and that he had many times seen the other two robbers in Rufus' company in and around the victim's restaurant prior to the robbery.

In *People v. Griswold* (1977), 54 Ill. App. 3d 246, 369 N.E.2d 392, also cited in the court's opinion in the case at bar, the court pointed out that defendant's tendered instruction on identification was properly refused because it did not "conform to the evidence because Sergeant Keckler [the armed robbery victim] testified that he saw defendant three times the night of the robbery while defendant's instruction refers to a single sighting. The trial court correctly refused defendant's identification instruction."

It is quite apparent that the *Griswold* court improperly relied on its erroneous interpretation of *People v. Fox* (1971), 48 Ill. 2d 239, and mistakenly stated, "IPI Criminal 1.02 and 2.03 on credibility and burden of proof, respectively, have been held sufficient to instruct the jury as to the defense of mistaken identity." (*Griswold*, 54 Ill. App. 3d at 251.) The opinion in the case at bar, also based upon the court's improper reliance on its mistaken interpretation of *Fox*, likewise erroneously states, "that Illinois courts have rejected the giving of a separate instruction for identification, holding that IPI Criminal 2d No. 1.02 (witness credibility) and IPI Criminal 2d No. 2.03 (burden of proof) sufficiently instruct the jury on the issue of misidentification." 183 Ill. App. 3d at 606.

The following complete language of *Fox* on the identification instruction issue clearly reveals that *Fox* does not hold that "IPI Criminal 2d No. 1.02 (witness credibility) and IPI Criminal 2d No. 2.03 (burden of proof) sufficiently instruct the jury on the issue of misidentification," (183 Ill. App. 3d at 606) nor precludes the giving of, nor justifies the refusal to give, an additional instruction on the aforementioned four elements of identification.

"The court refused to give defendant's instruction No. 3 on

the subject of identification. The defendant complains that since his theory of defense was erroneous identification he had a right to have his instruction on identification given. IPI-Criminal section 3.15 recommends that no instruction be given on this subject stating that the subject is adequately covered by instruction No. 1.02 on credibility of witnesses.[1] Instruction No. 1.02 was given as State's Instruction No. 2. The court also gave IPI-Criminal Instruction No. 2.03 as State's instruction No. 4. This instruction covers the presumption of innocence and the burden of proof on the State to prove the defendant guilty beyond a reasonable doubt. *We think these two instructions adequately cover the subject matter of defendant's instruction No. 3 in a clearer and more concise and accurate manner than defendant's instruction.* We are not informed whether the language of defendant's instruction No. 3 has ever been judicially approved. We do note however, that *its language violates the spirit of the last sentence of our Rule 451(a)* (43 Ill. 2d R. 451(a)) which provides: 'Whenever IPI-Criminal does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument.'

We conclude that this instruction is not simple, brief, impartial and free from argument. It contains many of the evils IPI-Criminal seeks to avoid. *If a party wishes to have the jury instructed on a subject that is not covered by IPI-Criminal he must tender an instruction to the court that does not violate the spirit of Rule 451(a)."* (Emphasis added.) *People v. Fox* (1971), 48 Ill. 2d 239, 249.

---

[1]The original section 3.15 of IPI Criminal, referred to in *Fox*, has been eliminated. It stated that the committee recommended that no instruction be given on the circumstances of an identification on the ground that the subject was adequately covered by the instruction on the credibility of witness, IPI No. 1.02. The complete comments to IPI Criminal 2d No. 1.02 (1989 Supp.) now state however: "While this instruction contains most of the usual elements of believability, the Committee recognizes that the evidence in a particular case could call for the insertion of additional elements. For example, in a case involving eyewitness identification, the trial judge may add factors such as, [1] the witness's opportunity to view the offender at the time of the offense, [2] the witness's degree of attention at the time of the offense, [3] the accuracy of the witness's earlier description of the offender, [4] the level of certainty shown by the witness when confronting the defendant, and [5] the length of time between the offense and the confrontation. See *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *People v. Manion*, 67 Ill. 2d 564, 367 N.E.2d 1313, 10 Ill. Dec. 547 (1977)."

From the foregoing language of *Fox*, it is quite apparent that *Fox* does *not* hold that IPI instructions Nos. 1.02 and 2.03 sufficiently instruct the jury on the law in assessing identification testimony and on the circumstances to be considered in evaluating an identification, or that no additional instruction on identification need be given. Quite the contrary.

Our supreme court just recently held in *People v. Slim* (1989), 127 Ill. 2d 302, 307:

"*In assessing identification testimony*, our courts have generally been using steps set out by the Supreme Court in *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375. There the Court held that *circumstances to be considered in evaluating an identification include*:

*(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation.*" (Emphasis added.)

These foregoing five "circumstances to be considered in evaluating an identification" and "in assessing identification testimony," pronounced by our supreme court in *Slim*, a bench trial where the trial judge is presumed to know the law, *a fortiori*, must be given in the form of an instruction on the law to a jury, which is not presumed to know the law.

IPI criminal instructions did not change, but only codified Illinois law on jury instructions. Thus, the following language of *People v. Ricili* (1948), 400 Ill. 309, 315-16, although predating the IPI criminal instructions, is nevertheless uniquely applicable to the instant case:

"Our attention is directed at this point to an [identification] instruction which was tendered by the defendant and refused by the court ***.

The instruction was refused and no other instruction was given to the jury covering the question of identification. It was the position of the People that the instruction as offered contained elements not shown by the evidence and *** was not supported by any evidence. *A similar instruction was tendered* in the case of *People v. LeMar*, 358 Ill. 58, *which was refused by the court. We there held that this was reversible error as no instruction was given by the trial court on the ques-*

*tion of the defendant's identification, and that the refusal to submit any instruction to the jury on this important issue may have prejudiced defendant,* especially since he was identified only by one of four eyewitnesses to the crime. *He had a right to have the jury instructed on his theory of the case.* [Citations.]

We think in the instant case it was error to refuse this instruction. If there could have been any question as to that part of the instruction above referred to *it could have properly been modified* by the court striking out the line objected to as set out above, *thus not depriving defendant of a crucial instruction pertaining to the law as applicable to his case."*
(Emphasis added.)

Where a defendant relies on mistaken identification as his defense, the above-quoted language of *Fox, Slim* and *Ricili,* the above-quoted recommendations by the committee comments regarding IPI Criminal 2d No. 1.02, the State and the defendant's right to have the jury correctly and completely instructed on the law applicable to each phase of their case, prudence, caution, wisdom, the exercise of good judgment, and to insure the validity of a conviction if one is obtained, dictate an instruction to the jury on the additional identification elements of (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention at the time of the offense; (3) the accuracy and the witness' earlier description of the offender to the police; (4) the level of certainty shown by the witness when confronting the defendant; and (5) the length of time between the offense and the witness' subsequent identification of the defendant as the offender.

For these foregoing reasons, I concur in the affirmance of the defendant's judgment of conviction.