THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RIGOBERTO MORENO, Defendant-Appellant.

First District (6th Division)   No. 1—90—2034

Opinion filed November 20, 1992.

Rita A. Fry, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara Jones, and Brian Holmes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Rigoberto Moreno, was convicted of the first degree murder of Michael Marrone (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)) and was sentenced to a term of 25 years. On appeal, defendant contends that (1) the trial court erred in instructing the jury on the law of accountability; (2) the State misstated the evidence and the law of accountability during its closing argument, depriving defendant of a fair trial; (3) the State failed to prove that defendant had the requisite "concurrent, specific" intent to commit murder; (4) the trial court erred in admitting testimony concerning a fight between the deceased and a codefendant which occurred six months prior to the murder; (5) the trial court abused its discretion in allowing the jury to view during deliberations photographs of three codefendants; and (6) the trial court abused its discretion by refusing to further question a prospective juror as to her opinion about gangs after defendant challenged the juror for cause.

This murder occurred as the result of certain gang members being stranded in a rival gang's territory. On January 13, 1989, the deceased was with his friends Oscar Rodriquez, Vince Tostado, and Paul Garza. All except Tostado were members of the C-Notes street gang. Garza testified at trial that the four were at Rodriguez's house drink-

ing beer. At around midnight, the group went out to buy more beer. As they were walking, a friend of Tostado's by the name of Jose drove up and offered them a ride.

Subsequently, the men in Jose's car were confronted by four individuals in a Scirocco who were screaming at them and making obscene gestures. (These four individuals have never been identified.) Jose attempted to avoid them, but the Scirocco cut Jose off and forced him to stop in the middle of the street. The men emerged from the Scirocco, displayed a badge and gun, and started searching the deceased and his companions. They then scattered various personal items belonging to the deceased and the others onto the street before locking the keys to Jose's automobile in the trunk and departing.

The Spanish Cobras street gang was a rival of the C-Notes gang. When the Scirocco stopped Jose's car, they were in the Spanish Cobras' neighborhood. Defendant was sitting in a car with Rosalio Najera, Bennie Chavez, and Louis Vela, watching the men in the Scirocco search the deceased and his friends. Najera testified that their car was parked in a vacant lot about 30 feet from Jose's car when the two cars pulled up. Vela informed defendant and the others that the individuals in Jose's car were C-Notes. At this point, according to Najera, he and defendant left to go get some of their own gang members to tell them that C-Notes were stranded in Spanish Cobra territory.

They went to a nearby bar and found codefendant Horatio Cosme, nicknamed "June Bug," out in front. Defendant and Cosme went into the bar while Najera remained outside. After a few minutes, defendant and Cosme came out of the bar accompanied by codefendant Danny Leal. All three were Spanish Cobras. Cosme and Leal instructed defendant to tell Najera to leave. Najera left the bar and returned to where their car was parked in the vacant lot.

While defendant and Najera were at the bar, their companions Vela and Chevez gave the deceased and his friends a knife and crowbar to use to get their keys out of the trunk. Once the trunk was opened, the deceased and the others began picking up their belongings off the street. Garza, Rodriquez, and the deceased then entered the car and sat in the back seat. The deceased sat behind the passenger's seat. Jose and Tostado sat in the front seat, but got out to look for Jose's wallet.

While the two were looking for the wallet, six or seven men carrying baseball bats and sticks approached the vehicle. Najera testified that Leal, Cosme, and codefendant Felipe Rosales were among them. Rosales, who was also a Spanish Cobra, pointed to the deceased, who was inside the car, and stated, "I know you, you're a C-Note." Garza

had earlier testified that six months prior to the murder, he and the deceased were walking along the lakefront when they encountered Rosales, at which time Rosales and the deceased engaged in a fist fight. He did not recall defendant being present when this fight occurred.

The group of men who were with Rosales began hitting the car with baseball bats, sticks, bottles, and bricks. Rosales hit the deceased's side of the car and broke one of the windows with a bat while Leal broke out the front windshield. A couple of other men chased Tostado and Jose down the street. Still others were hitting the car and throwing bricks and bottles at the car, while Rosales was yelling, "You are C-Notes!" Najera testified that while he was watching the men beat on the car, he heard three shots and saw "flashing" coming from the passenger's side of the car. Najera did not see who fired the shots, but he noticed Rosales and Cosme standing next to each other on the passenger side of the car. Najera did not see defendant near the car, but did see a second group of people standing farther away.

Garza testified that the whole time the men were hitting the car, he kept his head down because "glass was flying all over." Eventually, Tostado jumped into the car, started it, and drove down the block to pick up Jose. The deceased was in the car bleeding badly.

Detective Dennis Keane was assigned to investigate the murder. From January 16 to January 23, 1989, he attempted to locate defendant to question him about the events leading up to the murder. On January 23, defendant and Leal voluntarily came to police headquarters. After advising defendant of his *Miranda* rights, Keane and Detective Gregory Baiocchi interviewed him. Defendant initially denied any knowledge or participation in the shooting and stated that he was out visiting a friend at the time of the incident. Later that day, after being shown statements given by other suspects, defendant acknowledged he was present and agreed to tell the police what happened.

Subsequently, defendant spoke with Assistant State's Attorney LeFevour. In the presence of Keane and Baiocchi, LeFevour advised defendant of his *Miranda* rights and took down a six-page statement given by defendant, which defendant read and signed. LeFevour informed defendant that he could change any part of the statement that he found to be incorrect; defendant made several corrections and initialed them. Defendant signed his name at the end of each page, as did LeFevour, and the two detectives.

In his statement, defendant stated that he was in a parked car drinking beer when the incident between the Scirocco and Jose's car

occurred. Defendant was a member of the Spanish Cobras street gang, and his gang is a rival of the C-Notes street gang. He saw the Scirocco drive by and pull Jose's car over. He then saw the passengers of the Scirocco get out and search the individuals in the second vehicle; he saw them search the second vehicle's trunk, remove a baseball bat, close the trunk, and leave.

Defendant went to look for fellow gang members. He found Cosme and Leal. Defendant told them that there were rival gang members "stuck with their car over on Erie." Cosme told defendant he was going to get a gun. Defendant returned to Jose's stranded car, followed by codefendants Cosme, Rosales, Leal, and Velasquez. Rosales began hitting the car with his hand, then pointed at the deceased and said that he was a C-Note. Defendant picked up a brick and threw it at the passenger window, while Leal smashed the windshield with a board. The driver of the car was trying to start it when defendant heard two clicks from a gun and then two shots fired from the gun. Defendant looked to see where the shots came from and saw a gun in Cosme's hand. Defendant ran and spent the night at Velasquez's house. Subsequently defendant turned himself in to police.

During the jury instructions conference, defense counsel objected to the form of the accountability instruction offered by the State. The instruction was given to the jury over that objection.

Defendant first contends that the trial judge erred in giving the jury an accountability instruction which mirrored the language of Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. Supp. 1989) (hereinafater IPI Criminal 2d). IPI Criminal 2d No. 5.03 (Supp. 1989) states:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of [(an) (the)] offense.

[The word 'conduct' includes any criminal act done in furtherance of the planned and intended act.]"

The Committee Note following IPI Criminal 2d No. 5.03 (Supp. 1989) gives the following guidelines:

"Use the bracketed word 'an' and use the bracketed paragraph when the offense charged is different than the planned and intended offense, but done in furtherance of it. *People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29; *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746."

■ In this case, "an offense" was used in the instruction given to the jury. Defendant argues that in allowing the State to use *"an* offense" instead of *"the* offense" in its accountability instruction, the jury was improperly permitted to hold defendant legally responsible for Cosme's shooting of the deceased based on a showing that defendant and Cosme planned to commit *some* offense other than first degree murder. Although the State contends that its theory was that defendant planned and intended to commit battery or, at the least, criminal damage to property, defendant maintains that the State's theory at trial was actually that defendant planned and intended to murder the deceased. Thus, defendant argues, since the planned and intended offense by defendant was murder, and since the sole charge against defendant was murder, according to the Committee Notes to IPI Criminal 2d No. 5.03 (Supp. 1989), use of "an offense" in the jury instruction was improper because the charged offense and the planned and intended offense, namely murder, were the same.

It is true that the sole charge against defendant was first degree murder. However, our reading of the facts leads us to conclude that on the night of January 13, defendant planned and intended to commit any number of offenses other than the first degree murder of the deceased, making the accountability instruction, as given, proper.

As the facts indicate, defendant was a member of one street gang, which was a rival of the street gang to which the deceased belonged. When the car in which the deceased was a passenger was stopped by the men in the Scirocco, they were in the Spanish Cobras' neighborhood. Defendant witnessed the confrontation between the men in the two cars. When the Scirocco drove off, defendant knew that the deceased and his companions were stranded and that they were rival gang members.

Rather than assist the deceased and the others in retrieving their car keys from the trunk of their car, as Vela and Chevez did, defendant actively sought out fellow gang members in the area to inform them that rival gang members were stranded in their neighborhood. He located Cosme, the shooter, and Leal. He told Cosme and Leal that some rivals were "stuck with their car over on Erie." Cosme told defendant he was going to get a gun. Defendant made no attempt to withdraw from the impending confrontation, but instead returned to where the deceased and the others were stranded, followed by codefendants Cosme, Rosales, Leal, and Velasquez. They beat on the car in which the deceased was sitting, and defendant picked up a brick and threw it at the passenger window of the car. The deceased was seated closest to that window. Defendant heard two clicks from a gun

and then two shots fired from the gun, which he saw was in Cosme's hand. Defendant ran from the scene and hid. His written statement to police substantiated his participation in the events leading to the deceased's murder.

We find from the evidence that defendant, at the very least, planned and intended, and in fact committed, the offense of criminal damage to property by throwing a brick through the car window. We find further that defendant planned and intended, along with his associates, to commit the offense of battery against the deceased and his companions. These findings support the conclusion that the accountability instruction, as given, was proper.

■ In *People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, our supreme court reiterated the long-established "common-design rule." (See also *People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29; *People v. Armstrong* (1968), 41 Ill. 2d 390, 243 N.E.2d 825.) That rule provides, "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts." (*Kessler*, 57 Ill. 2d at 496-97, 315 N.E.2d at 32.) Thus, under this rule, an accomplice can be held accountable for murder even without a showing of an intent to kill. In *Terry*, the court affirmed the defendants' convictions for murder and armed violence based on a showing that they had conspired with others to commit the offense of battery. The court held that since the result of their concerted acts was murder, though the defendants themselves did not actually do the killing, under the common-design rule, all were legally accountable for the murder. (*Terry*, 99 Ill. 2d at 515, 460 N.E.2d at 749.) We see no reason why a similar result should not issue here.

■ We reject defendant's contention that he could not have been found guilty of first degree murder absent a showing that he possessed the concurrent, specific intent to promote or facilitate the commission of that offense. In support, defendant cites *People v. Taylor* (1991), 219 Ill. App. 3d 47, 579 N.E.2d 383. There, the court held that the defendant's conviction for involuntary manslaughter could not stand absent proof that he intended to promote or facilitate the commission of that offense. The State, however, argued that the defendant's guilt was established by showing he was engaged in a common criminal design. The court acknowledged the "common-design rule" but concluded that it was inapplicable in that case because there was no evidence that the defendant was engaged with others in any sort of illegal activity prior to the group committing the offense for which

he was found guilty, namely, involuntary manslaughter. (*Taylor*, 219 Ill. App. 3d at 50, 579 N.E.2d at 385.) Here, on the other hand, defendant set in motion the events which would eventually culminate in the death of the deceased. He rounded up other gang members to attack the deceased and his companions. Then, while his cohorts were beating on the car in which the deceased was sitting, defendant hurled a brick through the passenger window closest to the deceased, and, after Cosme fired the shots, fled the scene and hid from police for 10 days before turning himself in.

Moreover, contrary to what defendant argues, in determining the propriety of the instruction, it is irrelevant that defendant was not *charged* with any other offense besides first degree murder. That he planned and intended to commit *some* offense, whether charged or not, is sufficient to hold him accountable for the deceased's murder.

■ Defendant next contends that the State in its closing argument misstated both the evidence and the law of accountability, which served to deprive him of a fair trial. It is well settled that a prosecutor has great latitude in presenting his closing argument. (*People v. Wheatley* (1989), 183 Ill. App. 3d 590, 539 N.E.2d 276; *People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.) Further, a prosecutor has the right to comment on the evidence that has been adduced at trial and make all legitimate inferences therefrom. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) In determining the propriety of a closing argument, the reviewing court will generally follow the trial court's ruling absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) Further, improper remarks made by a prosecutor do not automatically require reversal unless they substantially prejudice a defendant. A defendant suffers substantial prejudice when the result of his trial would have been different had the improper comments not been made. *Wheatley*, 183 Ill. App. 3d 590, 539 N.E.2d 276.

Defendant cites as error several statements made by the prosecutor during opening and rebuttal closing arguments. Each will be addressed separately.

■ Initially, defendant contends that the following remark made by the prosecutor during her closing argument was error:

"MS. O'BRIEN [Assistant State's Attorney]: Now, you know that while he [defendant] is there he hears Cosme say I'm going to go get the gun and that's what he wanted to happen, he wanted that—

MR. SARLEY [Defense Attorney]: Objection. There is no evidence of that, your honor.

THE COURT: The jury heard the evidence. Proceed."

Later, the prosecutor stated that defendant brought other gang members to the street "where the victims [were] like sitting ducks." Based on the evidence of defendant's participation in the events leading to the murder, we find that defendant in fact intended that some harm come to the deceased and his companions, and consequently, that the prosecutor's comments were reasonable inferences properly based on that evidence. *Wheatley*, 183 Ill. App. 3d 590, 539 N.E.2d 276.

■ Next, defendant argues that the prosecutor improperly placed defendant next to the shooter and to the car in which the deceased was sitting:

"MS. O'BRIEN [Assistant State's Attorney]: [Y]ou know that the defendant is standing right next to Cosme when that gun is fired, and I submit that you know that because of what his statement says about being able to see that gun, he was standing on that passenger side, he is standing right next to Cosme—

MR. SARLEY [Defense Attorney]: Objection, your Honor. That is not the evidence from anywhere."

We find that this statement likewise was a reasonable inference based upon the evidence. Defendant in his written statement to police admitted that he threw a brick at the *passenger's* window. Defendant then stated that he "*heard* two clicks from the gun" and "then two shots from the gun." (Emphasis added.) He stated that he looked to see where the shots came from and *saw* a gun in "Junebug's" (Cosme's) hand. Further, Garza testified that the deceased was seated in the back of the car on the *passenger's* side. Collectively, the evidence establishes that defendant was on the passenger side of the car, and that Cosme likewise had to be on that side to have shot the deceased. Furthermore, it is reasonable to infer that the two were close enough to one another because defendant heard the clicks and shots coming from the gun.

■ Defendant next cites as error several comments made by the State in its closing rebuttal argument. Defendant argues that the prosecutor's comments emphasizing the immediacy of Cosme's firing the gun following defendant's throwing the brick through the car window were improper, particularly since they were designed to suggest to the jury the existence of a plan between Cosme and defendant to kill the deceased, which was unsupported by the evidence. We believe, however, that the comments represented reasonable inferences that were adequately supported by the evidence. (*Wheatley*, 183 Ill. App. 3d 590, 539 N.E.2d 276.) We give great weight to defendant's own

recollection of the events, specifically that he threw the brick at the passenger window, and then heard two clicks from the gun and then two shots. Given this, one could reasonably infer that the shots were fired relatively close in time to defendant's throwing of the brick.

■ Finally, defendant argues that the prosecutor in closing argument misstated the law of accountability in an effort to remove proof of a plan from the State's burden. Specifically, in describing the law of accountability, the prosecutor stated:

"MR. BARBARO [Assistant State's Attorney]: I will give you an example, how about two guys, they decide we [sic] are going to beat this guy up, he's been giving us a hard time, we don't want to kill him, we just want to beat him up. They [sic] go over there and during this incident or whatever one of them pulls out a knife and stabs the guy and kills him, the other guy says hey, I didn't intend to kill anybody, all I wanted to do was commit a battery.

The fact is they are both guilty of murder because they went there with the intent to commit a crime, that is the fact. Common sense tells us that is what [defendant] did, *and even if there was no plan and two guys start to beat up another guy both of them are throwing blows and one guy pulls out a knife and kills the man they are still guilty of murder*.

MR. SARLEY [Defense Counsel]: Objection, your honor.

MS. LAMBERT [Defense Counsel]: Objection. That's not the law.

THE COURT: Sustained. I will instruct the jury as to the law." (Emphasis added.)

We find that the prosecutor did, in fact, misstate the law of accountability by stating that even absent a plan, the individuals in his example would still be guilty of murder. As stated, the law of accountability requires a showing that defendant planned to participate with another in some criminal activity, which would make him accountable for any acts committed in furtherance of that activity. However, we find the erroneous remark to be harmless in light of the fact that the trial judge admonished the jury that he would "instruct the jury as to the law," and later did in fact properly instruct the jury on the law of accountability. See *Terry*, 99 Ill. 2d 508, 460 N.E.2d 746.

■ Defendant next cites as error the testimony concerning the fight between the deceased and Rosales which occurred six months prior to the shooting. Prior to trial, defense counsel moved unsuccessfully to bar the admission of this testimony. The trial court allowed the evidence in because defendant was being tried under an account-

ability theory together with his codefendants, one of whom was Rosales.

In *People v. Smith* (1990), 141 Ill. 2d 40, 56, 565 N.E.2d 900, 906, our supreme court stated that "when the State undertakes to prove facts which the State asserts constitute a motive for the crime charged, it must be shown that the accused knew of those facts." Here, the State failed to produce any evidence that defendant knew about the fight. At trial, Garza testified that defendant was not present when the fight occurred, and there was no testimony that defendant was ever made aware of the incident. Absent defendant's knowledge of the fight, we cannot see how the fight was relevant to show a possible motive on defendant's part for the murder or how it tended to reflect on defendant's guilt. That defendant was being tried on an accountability theory with Cosme and the others is insufficient to justify admission of evidence of the fight, because implicit in this theory is that defendant knew about the fight and intended to retaliate against the deceased. There was no proof of that here.

Although it was error for the trial court to allow in evidence of the fight, under these circumstances, the error was harmless. An error is harmless when it could not reasonably have affected the result or contributed to the defendant's conviction (*People v. Sullivan* (1978), 72 Ill. 2d 36, 377 N.E.2d 17), or where properly admitted evidence was so overwhelming that no fair-minded jury would reasonably have voted to acquit. (*People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.) Here, if the trial court had excluded the testimony about the fight, the remaining evidence would still have overwhelmingly supported defendant's guilt under an accountability theory.

Defendant further argues that the trial judge committed error by allowing photographs of codefendants Rosales, Leal, and Cosme into the jury room during deliberations. The State argues that the photographs were relevant to corroborate Najera's testimony putting the three codefendants at the scene with defendant. Because this point was undisputed, however, we believe that the testimony of Najera on this issue was sufficient. Nevertheless, we find that the inclusion of the photographs during deliberations was harmless error.

Finally, defendant contends that the trial court abused its discretion by refusing to question a prospective juror as to her opinion of gangs after defendant challenged the juror for cause. At trial, defendant requested that potential jurors be questioned regarding their possible biases against street gangs. The trial court agreed to this request and specifically questioned each venireperson regarding his or her possible prejudice toward street gangs or those affiliated

with gangs. During *voir dire,* the following colloquy took place between the court and venirewoman M.T.:

"[THE COURT]: Have you ever been accused, a complainant, or a witness in a criminal case?

[M.T.]: No.

[THE COURT]: You've never been a victim of a crime, nor have any of your immediate family or close friends right?

[M.T.]: No.

[THE COURT]: The principles of law that I referred to, [M.T.], do you have any quarrel with any of these?

[M.T.]: No.

*[THE COURT]: Okay. This question regarding gangs and gang affiliation, does that set you off thinking one way or the other before you've heard any evidence?*

*[M.T.]: No. Well, I don't know.*

*[THE COURT]: Well, I mean, that fact standing alone, would that start you off thinking one way or the other before you heard any evidence from the witness stand?*

*[M.T.]: No.*

[THE COURT]: The—if [defendant] chose not to testify, would you hold that against him?

[M.T.]: No." (Emphasis added.)

Later, defense counsel challenged M.T. for cause based on her initial reluctance when answering the gang question. The trial court denied the motion and then denied a request by counsel to ask her the question again. Defendant maintains that in precluding defense counsel from excusing M.T. for cause, he was forced to use one of his peremptory challenges to excuse her, which he might have used on one of the remaining two jurors who had close family members murdered. Consequently, defendant argues, he was deprived of a fair trial.

The determination of whether a prospective juror possesses the state of mind which will enable him or her to give the accused a fair and impartial trial rests within the sound discretion of the trial court. (*People v. Thomas* (1980), 89 Ill. App. 3d 592, 411 N.E.2d 1076.) We find no abuse of discretion by the trial judge's refusal to permit defense counsel to excuse M.T. for cause or to allow further inquiry of her on the question of gangs. After M.T. responded, "No. Well, I don't know," to the initial question regarding gangs, the trial judge clarified the question for her and in return received a definitive response demonstrating her impartiality on this issue. The trial judge

was in the best position to judge M.T.'s certainty and sincerity in her responses, and we do not believe defendant was prejudiced by the trial judge's handling of this juror.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.