THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BOBBY COOKS, Defendant-Appellant.

First District (6th Division)   No. 1—90—2517

Opinion filed September 10, 1993.

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Gael McCaughey-O'Brien, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Bobby Cooks, was found guilty of murder and was sentenced to natural life imprisonment without possibility of parole. On appeal, he contends that: (1) he was improperly convicted of being accountable for the murder of Michael Thomas where the State's evidence failed to show that he had any connection with the unknown, unidentified person who killed Thomas by shooting him with a shotgun, and accordingly, defendant claims that he is entitled to a new sentencing hearing

since his sentence of natural life imprisonment was predicated upon being guilty of murdering more than one individual (the other person killed was Romelle Gales); (2) he was denied a fair trial where the prosecutor made improper remarks during closing arguments which (a) misstated the law of accountability, and (b) argued without any factual basis that defendant interacted with a party who was never seen or identified; and (3) he was denied his right to due process and a fair trial where the State misled the jury into believing that he hid from the police for several days following the offense, when the State was aware that he was arrested by the police for another offense less than 24 hours after the present offenses occurred.

On the evening of October 3, 1986, Michael Thomas and Romelle Gales were shot and killed at the Sherman Park Inn located at 52nd and Racine Street in Chicago.

The State presented evidence that the victims and defendant belonged to rival gangs. Witnesses for the State testified that earlier in the evening a group of rival gang members, including Thomas, tried to attend a party being held at defendant's home. When defendant told the group that the party was for family only and refused to allow them to enter, a fight between a man named Steve and defendant ensued. After Steve struck defendant, defendant said that he was going to get his gun and drove off. Thomas remained at defendant's home for a time arguing with defendant's family.

Shortly thereafter, defendant and several members of his gang confronted James Stevenson and Andre Guest, members of a rival gang, on the street. Defendant forced Stevenson to lie down and held a gun to his head. Guest knew one of defendant's companions and, as a result, he and Stevenson were allowed to go free.

Defendant proceeded to the Sherman Park Inn. Thomas was present and earlier had told his friends that they "had gotten into it" with defendant's gang. Standing outside the tavern, defendant pointed his gun at two friends of Thomas, but the gun "clicked." Defendant left but returned shortly thereafter with a loaded handgun. At that time, Thomas and his friends were leaving the tavern. When they saw defendant, they attempted to reenter the tavern, but became locked in the vestibule. One State witness testified that defendant said he was going to kill Thomas. Defendant ran up to the front of the tavern and fired the gun through the window, striking Thomas in the leg. Defendant kicked in the vestibule door and fired two more shots, one of which struck Gales in the head, killing him. The arm of an unidentified individual then stuck a shot-

gun through the tavern door and fired it once, striking Thomas in the stomach and killing him. The witnesses were unable to see or identify the person who fired the shotgun.

The State witnesses identified defendant before and at trial as the one who shot Thomas in the leg and Gales in the head. They stated that defendant was wearing a fingerwave hairstyle with a gold streak.

Defendant offered the testimony of several alibi witnesses. They stated that defendant was at a party at his friend Troy's home from 9 p.m. until 3 a.m. Defendant was at the door helping to collect the $1 admission and never left the party.

Defense witnesses also testified that defendant's hair was natural and that he did not use spray-in color. They stated that it was not defendant, but Nick Charles, who fought Steve and promised to avenge the fight. Charles wore a fingerwave with a gold streak.

Following arguments and instructions, the jury returned a general verdict of guilty against defendant of the murders of Gales and Thomas. The State announced its intention to seek the death penalty, and defendant waived sentencing by the jury. At the first phase of the sentencing hearing, the court found defendant eligible for the death penalty based on his being found guilty of murdering more than one individual. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3).) At the second phase of the sentencing hearing, however, the court found mitigating factors sufficient to preclude the death penalty. It, therefore, sentenced defendant to natural life imprisonment without parole.

Defendant first contends that the State failed to prove beyond a reasonable doubt that he was accountable for the actions of the unidentified individual who shot and killed Thomas. Specifically, defendant asserts that the State failed to prove that he solicited, aided, abetted or agreed or attempted to aid the unknown, unidentified person who shot and killed Thomas. He maintains that it is apparent that he was alone both times he approached the tavern. He further asserts that the State failed to prove that he knew or intended that his actions would promote or facilitate the conduct of this unknown person and, in fact, alleges that the State failed to show any connection whatsoever between him and the unknown, unidentified person who killed Thomas. He also points out that according to the pathologist, Thomas' leg wound could not have been fatal. Therefore, in light of this, defendant maintains that his conviction for the murder of Michael Thomas must be reversed and this cause remanded for a new sentencing hearing, since his current

sentence of natural life imprisonment without the possibility of parole was based upon his convictions for multiple homicides.

In Illinois, a person is legally accountable for the conduct of another when either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c); *People v. Foster* (1990), 198 Ill. App. 3d 986, 556 N.E.2d 1214.) For purposes of determining legal accountability, the crime is not considered to have been completed until the accused has escaped from the scene. (*People v. Johnson* (1991), 220 Ill. App. 3d 550, 581 N.E.2d 118.) The intent to promote or facilitate the commission of a crime can be shown by evidence that the defendant shared the criminal intent of the principal or that there was a common design or community of unlawful purpose. (*Foster*, 198 Ill. App. 3d 986, 556 N.E.2d 1214.) The well-established common-design rule provides that " 'where two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts.' " (*People v. Moreno* (1992), 238 Ill. App. 3d 626, 633, 606 N.E.2d 514, 519, quoting *People v. Kessler* (1974), 57 Ill. 2d 493, 496-97, 315 N.E.2d 29, 32.) Community of unlawful purpose or common design may be established based on the circumstances surrounding the commission of the offense. (*Foster*, 198 Ill. App. 3d 986, 556 N.E.2d 1214.) Although by statute accountability requires that the accused assist prior to or during the commission of the crime, such assistance may be inferred from activities occurring after the offense. (*Foster*, 198 Ill. App. 3d 986, 556 N.E.2d 1214.) In determining whether there exists a common design, a court will consider such factors as the defendant's continued association with the perpetrator after the criminal act and his failure to report the crime. (*Foster*, 198 Ill. App. 3d 986, 556 N.E.2d 1214.) "Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute circumstantial evidence which may tend to prove and establish a defendant's guilt." (*Foster*, 198 Ill. App. 3d at 993, 556 N.E.2d at 1219.) For example, if the evidence places the accused at the scene of the crime during its commission and shows that he neither disapproved nor opposed it, the trier of fact may infer that the accused assented to the crime and thereby aided and

abetted its commission. *Johnson*, 220 Ill. App. 3d 550, 581 N.E.2d 118.

A trier of fact's finding that a defendant is legally accountable for a criminal act will not be set aside on review unless the evidence, when viewed in the light most favorable to the prosecution, is so improbable or unsatisfactory that a reasonable doubt of the defendant's guilt exists. *People v. Lovelady* (1991), 221 Ill. App. 3d 829, 582 N.E.2d 1217.

In the present case, the State's evidence showed that defendant and the victims belonged to rival gangs. The evidence further established that defendant and Steve, one of Thomas' fellow gang members, argued at defendant's home shortly before the shootings. Thomas was arguing with defendant's family at the time Steve struck defendant. Immediately thereafter, defendant left, stating that he was going to get his weapon. He then went looking for these rival gang members with other members of his own gang. Shortly before the shootings at the Sherman Park Inn, defendant and about 10 to 12 of his fellow gang members confronted Stevenson and Guest. Defendant let Stevenson go, only because Guest knew one of defendant's gang. Defendant then proceeded to the Sherman Park Inn. Thomas was there telling his friends about his earlier quarrel with defendant's gang. Defendant approached two members of Thomas' group who were waiting outside of the tavern. He pointed his gun at them and fired, but the gun just clicked. Defendant went away, but as Thomas and the others were leaving the tavern, defendant returned with a gun and ran towards them. Attempting to return to the tavern, Thomas and the others became trapped inside the vestibule. Defendant began to fire at them through the vestibule window. Thomas was struck in the leg. Defendant then kicked in the door and fired into the vestibule, striking Gales in the head and killing him. An "arm" holding a shotgun then fired into the vestibule, striking Thomas in the stomach and killing him. The witnesses in the vestibule with the victims at the time of the shootings identified defendant as the man who fired the handgun into the vestibule window, striking Thomas in the leg. They were, however, unable to identify who the "arm" belonged to as they only saw it reach around the door holding a shotgun which blasted Thomas in the stomach.

■■ Although there is no evidence that defendant entered into an agreement specifically with the second unidentified shooter, it is logical to conclude that defendant aided him by virtue of his shooting the victim first, thereby making Thomas more vulnerable and

prone to a second attack. Defendant's first shot facilitated the second and, therefore, the offense. (See *People v. Zubik* (1992), 225 Ill. App. 3d 950, 588 N.E.2d 437.) Furthermore, the "common-design rule" is applicable where defendant "set in motion" the series of events which eventually culminated in Thomas' death. (*Moreno*, 238 Ill. App. 3d 626, 606 N.E.2d 514.) Defendant "rounded up" fellow gang members to look for and harm rival gang members, including Thomas whom he actually shot, and then fled the scene only to hide from the police. (*Moreno*, 238 Ill. App. 3d 626, 606 N.E.2d 514.) The manner in which defendant and the "arm" approached the group in the vestibule was nearly simultaneous, suggesting joint action. (*Johnson*, 220 Ill. App. 3d 550, 581 N.E.2d 118.) This, coupled with defendant's failure to intervene or voice opposition to the actions of the "arm," is sufficient to establish that defendant assented to and aided the "arm" in the commission of the murder of Thomas. *Johnson*, 220 Ill. App. 3d 550, 581 N.E.2d 118.

We believe that the evidence in this case sufficiently demonstrates a common design and a community of unlawful purpose between defendant and the second unidentified individual. (*Foster*, 198 Ill. App. 3d 986, 556 N.E.2d 1214.) Accordingly, we find no reason to disturb the jury's determination that defendant was accountable for the murder of Michael Thomas. *Foster*, 198 Ill. App. 3d 986, 556 N.E.2d 1214.

Defendant next contends that he was denied his due process right to a fair trial because the prosecutor made improper remarks during closing argument. Specifically, he alleges that the prosecutor: (1) misstated the law of accountability; and (2) argued without any factual basis that defendant interacted with a party who was never seen or identified.

Defendant first argues that the prosecutor misstated the law when he improperly argued that the purpose of the law of accountability was to convict people who band together and commit crimes as members of street gangs. Although the State initially maintains that defendant has waived this issue by his failure to raise these objections in his motion for a new trial, we will consider the issue.

In his brief, defendant cites the following passage from the prosecutor's closing argument:

"[Prosecutor]: Now, what about this accountability? What about this second man? The [l]egislators down in Springfield enact laws based on the fact that we elect them to enact laws.

[Defense Counsel Franks]: Objection.

THE COURT: The objection is overruled.

[Prosecutor]: One of the laws that they decided would be a good law was the law of accountability. What it is is legal responsibility. This law is not a new law, it is not some brand new concept, it has been around for a long time.

[Defense Counsel Meczyk]: Object to arguing the law, it is improper.

[Defense Counsel Franks]: Objection.

THE COURT: The objection is overruled.

[Prosecutor]: This law is meant for people who don't have the guts to do a crime by themselves, it is meant for people who need to band together in order to commit a crime, people like street gangs or street gang members because, you see, there is safety in numbers. What one gutless coward won't do by himself he will do when another of his buddies are with him, that is why the Legislature enacted that law. And I believe Judge Urso will tell you—if I could just have a moment.

[Defense Counsel Franks]: Judge, I will object to misstating the law.

THE COURT: The objection is overruled."

Defendant asserts that the argument above misstated the law of accountability and thus led the jury to believe that accountability applies to any situation where a defendant commits a crime while a member of a street gang. While we agree that something more than mere membership in a street gang is necessary to prove accountability, as demonstrated by our earlier discussion of the applicable law, we do not believe that the prosecutor's closing argument misstated the law of accountability when viewed in its entirety. In this regard, we note that defendant takes the prosecutor's remarks out of context as he fails to include in his brief the prosecutor's very next statements following the passage quoted above wherein he states:

"[Prosecutor]: I believe his Honor, Judge Urso, will tell you that 'A person is legally responsible for the condct [sic] of another person when either before or during the commission of an offense with the intent to promote or facilitate the commission of that offense he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of the offense.' The Defense would have you believe that the person with the shotgun is wholly separate and wholly unrelated to the person with the handgun;

that after Mr. Cooks was done shooting into the vestibule with his handgun somebody else from some other location came up with a shotgun and said, hey, we have already got one victim, let's add another one to it. Is that ridiculous? These people were acting in tandem and what one man does in acting as part of that tandem is responsible for the acts of the other person. And it is not a far-fetched concept, you are familiar with this in your own lives because you are responsible for other people in a legal sense as well, your families, your wives and children, you are legally responsible for them to some extent. It is the same kind of concept. When gang members get together to commit an offense they are each actually responsible for the acts that are committed during the course of that offense and that is what this trial is all about holding people responsible for their actions."

"Prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant [citation], considering the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445, 521 N.E.2d 38, 57.) The trial court's determination regarding the propriety of such argument should be followed absent a clear abuse of discretion. *Thompkins*, 121 Ill. 2d 401, 521 N.E.2d 38.

We do not view the argument as improper in light of the fact that the prosecutor accurately defined accountability as evidenced by this last passage. (*Johnson*, 220 Ill. App. 3d 550, 581 N.E.2d 118.) Moreover, this definition was repeated in the court's formal instruction to the jury which the jury was informed it had a duty to follow. (*Johnson*, 220 Ill. App. 3d 550, 581 N.E.2d 118.) Consequently, any potential for a misstatement of law and any prejudice therefrom was overcome by the argument, taken in its entirety, and the jury instruction which correctly defined the law of accountability. (*Johnson*, 220 Ill. App. 3d 550, 581 N.E.2d 118.) Therefore, because the prosecution is afforded great latitude in closing argument, as mentioned previously, and the remarks complained of do not exceed the bounds of legitimate argument, we do not find error in this instance. *Thompkins*, 121 Ill. 2d 401, 521 N.E.2d 38.

Defendant next cites as error several remarks made by the prosecutor during his closing argument. The three comments to which defendant takes exception were made while the prosecutor

was describing to the jury the events which transpired just prior to the shooting at the Sherman Park Inn. After defendant and a group of men had finished holding Stevenson to the ground, the prosecutor argued:

> "The [d]efendant's friends probably said, well, we had our fun, let's go back to the party, we had enough of this stuff and went back to the party on La Salle. But not the [d]efendant, not the [d]efendant and his partner, the partner he talked into keeping going with him, that wasn't enough for them because this [d]efendant had murder on his mind when he was out there on his hunting expedition ***."

When discussing the incident outside the Sherman Park Inn during which defendant pointed a gun which ultimately misfired at two individuals, the prosecutor argued:

> "So what did he do? He went back the way he came. Now you all saw the gangway and came down this alley. I don't know if you saw the alley while you were out there, it's over here. He came down—he has got to be talking to his partner, the guy with the shotgun, back here someplace. All right. He says you are backing me up this time, the gun ain't working right."

Finally, arguing that defendant returned to the front of the Sherman Park Inn firing his gun at the people inside the vestibule, the prosecutor stated:

> "This time the gun works though and that is when the shooting starts, and his partner comes in right behind him with the shotgun and fires the shotgun into that crowded vestibule with the nine people."

Defendant maintains that the State's evidence in this case shows that he was alone both times he approached the Sherman Park Inn. He further maintains that there was never any evidence indicating that he was in the presence of, engaged in conversation with or made plans with a partner who was in possession of a shotgun. Defendant argues that these improper remarks led to his unfair conviction for murder based on accountability. Viewed individually or cumulatively, he asserts, these arguments denied him his right to a fair trial.

The record reveals that Thomas was arguing with members of defendant's family at their home at the time defendant was struck by one of Thomas' friends and fellow gang members. Defendant then obtained his weapon and, along with some of his fellow gang members, searched out and assaulted members of this rival gang.

Defendant then went to the tavern, where he approached two rival members and fired his gun at them, but it only clicked. Defendant went away only to return moments later with a loaded handgun, which he fired through a window into the vestibule of the tavern where the rival gang members were trapped. Thomas was struck in the leg. Defendant then kicked in the door of the vestibule and again fired into the vestibule. Although aiming at Thomas, he struck Gales in the head. Defendant disappeared behind the door, and an "arm" holding a shotgun fired into the vestibule. Eyewitnesses could not identify the "arm," but thought that it either belonged to defendant or that there "had to be 2 of them."

■ This testimony established that defendant and his fellow gang members went looking for Thomas and other members of his gang in an effort to harm them. Defendant either acting alone or in concert with his fellow gang members fired into the vestibule of the tavern shooting and killing Thomas and Gales. Such evidence of joint action and purpose to kill Thomas and Gales was proof of partnership. "[A]s such, the prosecutor could comment upon this evidence and draw all legitimate inferences therefrom." (*Thompkins*, 121 Ill. 2d at 445, 521 N.E.2d at 57.) Accordingly, we view the comments as proper inferences drawn from facts contained in the record (*People v. Lasley* (1987), 158 Ill. App. 3d 614, 511 N.E.2d 661) as they were reasonable and adequately supported (*Moreno*, 238 Ill. App. 3d 626, 606 N.E.2d 514).

■ We have reviewed each of the prosecutor's closing remarks presented by defendant as prejudicial to his cause and find that the comments do not, either individually or cumulatively, amount to plain error. (*Lasley*, 158 Ill. App. 3d 614, 511 N.E.2d 661.) Because the comments were not so prejudicial that they deprived defendant of a fair trial or "so flagrant that they threatened the deterioration of the judicial process," we will not reverse on this basis. *Lasley*, 158 Ill. App. 3d at 633-34, 511 N.E.2d at 675.

■ In his third and final contention, defendant claims that he was denied his right to due process and a fair trial when the prosecutor during closing argument misled the jury into believing that he hid from police for several days following the present offense, when in fact the State was allegedly aware that he was arrested by police for another offense less than 24 hours after the shootings occurred at the Sherman Park Inn. This assertion is belied by the record.

During the cross-examination of Luvenia Cooks, defendant's sister, the prosecutor established that defendant lived with Luvenia. He then established that defendant had not been home when the

police visited the home during the four or five days following the shootings. Defendant's sister knew that the police were looking for defendant. During closing argument, the prosecutor argued that the evidence showed that defendant hid from the police for a period of six days following the murders. Defense counsel subsequently made a motion for mistrial in which he alleged that the State deliberately misled the jury. Defense counsel stated that defendant was arrested for possession of marijuana at 7:25 p.m. on October 4, 1986, and, therefore, could not possibly have been in hiding from the police. He further stated that had he known that the prosecutor was going to argue that defendant was in hiding he would have called Officer Chambers, the officer who arrested defendant on October 4, 1986, to testify. Defense counsel admitted, however, that defendant's October 4 arrest was never admitted into evidence. The State then responded that its argument was based on proper inferences drawn from the evidence. The trial court denied the motion for a mistrial.

With regard to defense counsel's assertion that defendant was arrested on a narcotics charge on October 4, which he made in objection to the prosecutor's argument, there was no evidence presented at trial to support this nor was there any evidence that the prosecutor was aware of this. Even if it were to be assumed that such an arrest did occur, there was no evidence that the police identified defendant as the shooter at the time of this alleged arrest. In fact, the report of the proceedings shows that defendant was not in custody as of October 5. Because the police were unable to find defendant at home after repeated attempts, they arrested him outside of a courtroom upon learning that he had a court date relating to a 1985 arrest. Therefore, in light of the evidence that defendant was not in custody, lived with his sister, who knew that the police were looking for him, and was never home when the police came to the house, it cannot be said that the prosecutor's comments were improper.

For the reasons stated herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RAKOWSKI and GIANNIS, JJ., concur.