No. 2--05--0442     Filed: 4-17-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CM--4226 |
| LEWIS E. KUHNS, | ) ) ) | Honorable Donald H. Geiger, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the opinion of the court:

Following a jury trial, defendant, Lewis E. Kuhns, was convicted of criminal damage to property under $300 in value (720 ILCS 5/21--1(a) (West 2004)), and sentenced to 12 months of conditional discharge, 150 hours of community service, and a $100 fine. On appeal, defendant contends that (1) he was denied the effective assistance of trial counsel, and (2) he is entitled to a $10 credit toward his fine for the time he spent in custody prior to being released on bond (see 725 ILCS 5/110--14 (West 2004)). For the following reasons, we affirm defendant's conviction and modify the trial court's sentencing order to reflect the appropriate credit.

On July 23, 2004, defendant was charged by information with the offense of criminal damage to property under $300 in value. The information alleged that, on July 10, 2004, defendant damaged a mailbox belonging to the victim, James Song.

On January 6, 2005, the case proceeded to trial. At trial, James Passolt testified that he lived on the corner of Marydale and Virginia Avenues in Lake Zurich. Passolt lived across the street from the victim's residence. Passolt testified that the victim's mailbox had been "blown up" by explosives on three separate occasions between June 12 and July 10, 2004. All three incidents occurred between 10 and 11 p.m. On July 10, 2004, at approximately 10 p.m., Passolt decided to watch the victim's mailbox from a location behind some bushes in his own yard. Passolt testified that the area around the mailbox was illuminated by a streetlight approximately 30 to 40 feet away. Passolt testified that, at 10:45 p.m., he observed an individual riding a minibike west on Marydale. When the rider reached the victim's mailbox, the rider turned around and then stopped on the east side of the victim's driveway. The rider remained for a minute and then headed east on Marydale.

Passolt testified that, a few minutes later, he observed the same minibike traveling west on Marydale accompanied by a second individual on a minibike. On this occasion, the minibikes passed under a streetlight and Passolt recognized defendant as one of the riders. Passolt did not recognize the individual riding the second minibike. Passolt testified that he was "pretty sure" that it was defendant who had been riding the minibike that he had initially observed. Passolt explained that, although he did not actually see defendant on the first occasion, defendant was riding the same style of minibike that he had observed earlier.

Passolt testified that defendant stopped his minibike approximately 10 to 15 feet from the victim's mailbox. The other rider then "did something" to the victim's mailbox. Both riders then left the scene and returned after a few minutes. Passolt testified that defendant again stopped his minibike several feet from the victim's mailbox, near the corner of the intersection of Marydale and another street. As defendant was "looking around," the other rider opened the mailbox. After a

couple of minutes, both riders left the scene. Passolt testified that he called to his wife inside and asked her to call the police. Passolt then walked toward the victim's mailbox. When he was within 10 or 15 feet of the mailbox, the mailbox exploded, scattering "shrapnel" in a 30-foot radius around the mailbox. Following the explosion, Passolt observed the two riders travel past the scene. As the riders turned the corner, they were stopped by a deputy sheriff. Passolt identified the two riders as the individuals he observed "blow up" the mailbox.

On cross-examination, Passolt testified that defendant and the other rider had actually stopped at the mailbox three times prior to the explosion. On all three occasions, one of the minibikes had its headlight activated, but the headlight was extinguished as the minibike approached the mailbox. Passolt testified that defendant stopped "directly across the street every time" while the other person went up to the mailbox.

Lake County Sheriff's Deputy Alexander Dador testified that, at approximately 10:30 p.m. on July 10, 2004, he was dispatched to Marydale Avenue in Lake Zurich to investigate a report of criminal damage to property. As Dador approached the scene, he saw two individuals riding minibikes. Dador stopped the vehicles. Dador testified that an individual named Craig Scarton was riding a minibike and that defendant was riding another minibike. Passolt, who was standing across the street, yelled out to Dador that he had just seen the riders of the minibikes "blow up" the victim's mailbox. Dador arrested defendant and Scarton.

Lake County Sheriff's Lieutenant Robert Randall testified that he and Dador interviewed defendant at the sheriff's department. Randall testified that defendant initially denied any involvement in the incident and stated that he and Scarton "were just riding minibikes." When Randall then said to defendant that he needed to determine whether the incident was a hate crime or

motivated by a vendetta against the victim's family, defendant stated that "it was not done as a vendetta." Defendant told Randall that he and Scarton "felt like they wanted to blow something up" and that they rode their minibikes around the neighborhood looking for something to blow up. Defendant stated that Scarton stopped at the victim's mailbox and placed an explosive inside. Defendant indicated that he became frightened when Scarton stopped at the mailbox, and that he left the scene and rode back to his house. Scarton soon returned to defendant's house. After hearing a "boom," defendant and Scarton returned to the scene to witness the damage.

Defendant also provided the police a written statement, which was admitted into evidence. Defendant's written statement provided, in relevant part, as follows:

"On July 10[,] 2004 me and [Scarton] wanted to blow something up so I remembered that I had a[n] M-80 or two in my garage. So I got it [and] gave it to [Scarton] and we went riding minibikes. Then as he was riding [Scarton] said stop[,] this one[']s good. [H]e stopped. I got scared and kept riding. Later at my house [Scarton] said he did it. And then we [heard] a boom. I wanted to see it so me and [Scarton] took a ride down and saw it. Then the police came and pulled [Scarton] over and I turned around. I know this act was wrong but I never put anything at anytime in a mailbox."

On cross-examination, Randall acknowledged that defendant never stated that he and Scarton had been looking specifically for a mailbox to blow up.

Defendant called Scarton to testify on defendant's behalf. Scarton testified that he received an M-80 firecracker from defendant at approximately 8:30 or 9 p.m. on July 10, 2004. Scarton told defendant that he wanted to "blow up something." Defense counsel then asked Scarton if he ever told defendant that he wanted to blow up a mailbox. Scarton replied affirmatively to this question.

Scarton testified that he and defendant rode dirt bikes "for fun" at 9:30 p.m. Sometime after 10 p.m., Scarton went on a ride by himself. Scarton rode by the victim's mailbox three times before he decided to "stop and put it in there." Scarton testified that defendant was not with him when he made his second ride by the mailbox. On the third trip, defendant was riding his dirt bike ahead of Scarton. When Scarton stopped at the mailbox, defendant "took off by himself" and "went a different way" without realizing that Scarton had stopped.

Scarton further testified that when he stopped at the mailbox, he turned off the headlight on his bike so that no one would see him. He used a cigarette to light the M-80 because that gave him time to leave before the explosion. After lighting the M-80, Scarton went to defendant's house, where he saw defendant. Upon hearing the explosion, defendant asked Scarton if he had blown up a mailbox, and Scarton admitted that he had. Scarton testified that he had lied to the sheriff's deputies when he told them that defendant had been with him when he blew up the mailbox. Scarton explained that he had lied because the sheriff's deputies threatened to put him in jail and kept insisting that defendant was involved. Scarton acknowledged that he and defendant had discussed blowing up the mailbox, but that this conversation had taken place a couple of hours before Scarton decided to blow up the mailbox.

Defendant testified on his own behalf. Defendant acknowledged that he had given Scarton an M-80 at approximately 7 or 8 p.m. on July 10, 2004, and recalled Scarton saying that he "was going to blow something up." Defendant did not recall Scarton saying anything about blowing up a mailbox, but acknowledged that he "could have said that." Defendant testified that he and Scarton rode dirt bikes around the neighborhood and then "chilled" at defendant's house until 9:30 p.m., when they decided to take "another night ride." During this ride, Scarton said to defendant, "Stop,

this one is good." Scarton stopped at the victim's mailbox and turned his headlight off. Defendant testified that he was scared and kept riding. Defendant believed that Scarton "was going to do something," and defendant did not want to be involved. Defendant testified that Scarton had "targeted" the victim's mailbox and that defendant did not know why he had selected the mailbox.

Defendant denied that he stopped at the corner to look around while Scarton was at the mailbox. Defendant acknowledged that he did not attempt to dissuade Scarton from damaging the mailbox and that he did not ask defendant to give him the M-80 back. Defendant rode back to his home alone, arriving sometime between 10:30 and 11 p.m. Scarton arrived at defendant's house a few minutes later. Defendant heard a "boom" and asked Scarton if he "blew it up." Scarton admitted blowing up the victim's mailbox. Defendant testified that he was curious to see the damage and that he rode back to the mailbox with Scarton to look. As they approached the mailbox, they were intercepted by the sheriff.

During closing argument, the State argued that defendant was accountable for Scarton's conduct because defendant "supplied the bomb, scouted the location, and acted as a lookout." During his closing argument, defense counsel stated that defendant could not be held accountable for Scarton's actions unless the State proved that he was part of "this common plan." Defense counsel argued that the State was required to prove that defendant gave Scarton the M-80 knowing that Scarton was going to blow up the victim's mailbox. Defense counsel argued that, "There has to be an agreement." Defense counsel argued that defendant did not know that Scarton was going to blow up the mailbox , and "the fact that [Scarton] had mentioned two hours earlier that he wanted an M-80 and the fact that he may have mentioned that he wanted to blow up a mailbox is not enough."

Defense counsel also argued that defendant could not be held accountable given the lapse of time between when defendant gave Scarton the M-80 and when Scarton used the M-80 to blow up the mailbox. Defense counsel rhetorically asked whether defendant could be held responsible if a week had passed between the transfer of the M-80 and its use by Scarton. Defense counsel argued that, "If there is any plan, it would have had to have taken place then and there." The trial court sustained the State's objection to this argument and instructed defense counsel to confine the argument to the facts of the case. Defense counsel further argued to the jury that, even if defendant and Scarton had entered an agreement, defendant withdrew from the agreement when he separated himself from Scarton. The trial court again sustained the State's objection to this argument and instructed the jury that the argument misstated the law.

Following deliberations, the jury found defendant guilty of criminal damage to property under $300 in value. The trial court subsequently conducted a sentencing hearing and sentenced defendant to 12 months of conditional discharge, 150 hours of community service, and a $100 fine. Defendant filed a timely notice of appeal.

Defendant's first contention on appeal is that he was denied the effective assistance of counsel. Defendant argues that his trial counsel misunderstood the law of accountability and presented testimony that established the defendant's guilt under an accountability theory. Specifically, defendant notes that, during closing argument, his counsel erroneously argued that the accountability doctrine required proof of an "agreement" and that, because defendant was not actually present when the crime occurred, the doctrine did not apply in the instant case. Additionally, defendant notes that his counsel called a witness, Scarton, who testified that defendant

knew of Scarton's intention to blow up a mailbox when he gave Scarton the M-80 a few hours prior to the incident.

Both the United States and Illinois Constitutions guarantee a defendant the right to the effective assistance of counsel. See U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8. The purpose of this guarantee is to ensure that the defendant receives a fair trial. Strickland v. Washington, 466 U.S. 668, 684-85, 80 L. Ed. 2d 674, 691-92, 104 S. Ct. 2052, 2062-63 (1984). The ultimate focus of the inquiry is on the fundamental fairness of the challenged proceedings. Strickland, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. However, there is a strong presumption of outcome reliability, so a defendant must show that counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064. To do so, the defendant must establish both (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Failure to establish either prong is fatal to the claim. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

With regard to the second prong, the burden is on the defendant to affirmatively prove prejudice. Strickland, 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2067. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Here, even if defense counsel was deficient in his calling and questioning of Scarton and in his closing argument to the jury, defendant's claim of ineffective assistance of counsel must still fail because he cannot establish prejudice. The evidence of defendant's guilt was overwhelming, and the result of the trial would have been no different even without counsel's alleged deficiencies. To obtain a conviction, the State was obligated to prove that defendant knowingly damaged the victim's property without the victim's consent. See 720 ILCS 5/21--1(a) (West 2004). The trial court also instructed the jury that defendant could be convicted upon an accountability theory. Under an accountability theory, a defendant may be held legally responsible for the conduct of another person if, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, [the defendant] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5--2(c) (West 2004). The State is not required to prove that the defendant entered into an agreement with another to commit a specific offense; instead, an intent to promote or facilitate the commission of a crime can be shown by evidence that the defendant shared the criminal intent of the principal or that there was a common design or community of unlawful purpose. People v. Stroner, 96 Ill. 2d 204, 211 (1983); People v. Cooks, 253 Ill. App. 3d 184, 188-89 (1993).

The evidence introduced by the State overwhelmingly established defendant's direct participation in the destruction of the victim's mailbox. Passolt testified that, after the victim's mailbox had been damaged by fireworks on three separate occasions over the previous month, he decided to watch the mailbox to discover the identity of the perpetrator. Passolt observed an individual on defendant's minibike ride up to the mailbox, stop for a moment, and then turn his minibike around and ride back in the direction from which he had previously come. Shortly

thereafter, Passolt observed defendant and another individual return on two additional occasions. On the second occasion, defendant stopped near the corner and "looked around," while the other individual opened the mailbox. After defendant and the other rider departed, the victim's mailbox exploded. Defendant and Scarton were subsequently intercepted by the sheriff near the scene following the blast, and Passolt identified them as the perpetrators. Passolt's testimony unequivocally established defendant's direct participation in the offense by scouting the scene prior to the offense and then acting as a lookout while Scarton placed the M-80 in the victim's mailbox.

Further, defendant's own testimony and statements to the sheriff established that he aided and abetted Scarton in a shared criminal intent to "blow something up." Although defendant denied that he knew that Scarton intended to blow up the victim's mailbox, he nonetheless acknowledged that he knowingly provided Scarton with an M-80 firecracker in response to Scarton's statement that he wanted to "blow something up." Defendant told the sheriff that he and Scarton then rode their minibikes around the neighborhood looking for something to "blow up." While defendant's testimony may not establish that he and Scarton had a shared agreement to blow up the victim's mailbox, his testimony nonetheless established beyond a reasonable doubt that he and Scarton had a common design to use illegal fireworks to damage someone else's personal property. The proof of the existence of this common design was all that was necessary to prove defendant legally accountable for Scarton's actions. See Cooks, 253 Ill. App. 3d at 188. Additionally, while defendant indicated that he was frightened when Scarton stopped to place the M-80 in the mailbox and that he left the scene, he acknowledged that he did not attempt to stop Scarton and that he did not request that Scarton return the M-80. Defendant and Scarton later returned to the scene of the crime together to view the damage. A trier of fact may infer a defendant's guilt from his or her presence at the scene

of the offense and evidence that he or she neither disapproved nor opposed the commission of the crime. Cooks, 253 Ill. App. 3d at 188. A trier of fact may also infer guilt by a defendant's continued association with the perpetrator after the criminal act and the defendant's failure to report the crime. Cooks, 253 Ill. App. 3d at 188.

In view of Passolt's and defendant's testimony, as well as the evidence of defendant's statements to the sheriff, a jury could reach no other verdict but to find defendant guilty. Under these circumstances, defendant cannot show that he was prejudiced by counsel's alleged deficiencies in calling and questioning Scarton and in arguing to the jury. Therefore, defendant's claim of ineffective assistance of counsel must fail. See Strickland, 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2067.

Defendant also contends that he is entitled to a $10 credit toward the fine imposed by the trial court. Defendant argues that he was entitled to a $5-per-day credit toward his fine for each day he spent in jail prior to sentencing, pursuant to section 110--14 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/110--14 (West 2004)). Defendant argues that the trial court failed to award him credit for the two days he was in custody following his arrest on July 10, 2004, and prior to posting bond on July 11, 2004. Defendant therefore requests that his fine be reduced by $10 to reflect the two days he spent in custody.

Section 110--14 of the Code mandates that a criminal defendant receive a $5-per-day credit toward any fine levied upon conviction of each day "incarcerated on a bailable offense" when the defendant does not supply bail. 725 ILCS 5/110--14 (West 2004). Illinois courts have consistently construed this section as entitling a defendant to a $5-per-day credit toward any fine for all days, and partial days, spent in custody prior to the imposition of sentence. See People v. McNair, 325 Ill.

App. 3d 725, 726-27 (2001); People v. Smith, 258 Ill. App. 3d 261, 270 (1994); People v. Raya, 250 Ill. App. 3d 795, 802-03 (1993).

The State argues that defendant is not entitled to receive credit for July 10 and 11, 2004, because he was held in custody for less than three hours and was never "incarcerated" for purposes of section 110--14. The State's argument is not well taken. This court has consistently held that a defendant is entitled to a $5 credit for every full day and partial day that the defendant is held in custody following his arrest and prior to posting bond. See Smith, 258 Ill. App. 3d at 267-68; People v. Stahr, 255 Ill. App. 3d 624, 627-28 (1994). Indeed, this court has previously rejected the State's argument that a defendant is not "incarcerated" for purposes of the statute if he or she successfully posts bond prior to trial. See Smith, 255 Ill. App. 3d at 268 (holding that a defendant's posting bond "does not preclude an award of the section 110--14 credit against the fine"). We decline to revisit these authorities and reject the State's argument that defendant must be physically placed in jail to receive credit for time spent in police custody. Under the authorities cited above, a defendant is considered "incarcerated" for purposes of section 110--14 once he or she has been arrested by the police.

Accordingly, we conclude that defendant is entitled to a credit of $10 toward the fine imposed by the trial court. Remand is unnecessary as this court has the authority to modify the trial court's sentencing order. See 134 Ill. 2d R. 615(b)(1). Therefore, we modify the trial court's sentencing order to reflect that defendant is entitled to a $10 credit toward his $100 fine. We also direct the clerk of the circuit court to refund any portion of the fine that has been paid in excess of $90.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County as modified.

Affirmed as modified.

McLAREN, J., concurs.

JUSTICE GILLERAN JOHNSON, concurring in part and dissenting in part:

I agree that the defendant's conviction should be affirmed. I also believe that the defendant is entitled to a $5 credit for the time that he was incarcerated on July 11, 2004. However, because I believe that the majority's analysis is flawed in its determination that the defendant is entitled to a $5 credit for less than one hour that he spent in custody on July 10, 2004, I must dissent from that portion of the majority's opinion.

At the outset, I note that the majority incorrectly frames the issue that the defendant is raising before this court. In his reply brief, the defendant acknowledges that he was not incarcerated on July 10. The defendant argues, however, that he should be awarded a $5 credit for that day anyway because his being arrested and held at the sheriff's office for questioning was "the practical equivalent of incarceration at the jail." Alternatively, the defendant contends that he should be awarded the credit to discourage the police from manipulating how much credit a defendant is entitled to. Rather than addressing these issues, the majority instead awards the defendant a $5 credit against his fine on the basis that he was in custody on July 10. In reaching this result, the majority treats the terms "custody" and "incarceration" as if they are synonymous. They are not. The term "custody" refers to actual imprisonment, as well as lesser restraints. People ex rel. Morrison v. Sielaff, 58 Ill. 2d 91, 93 (1974), citing Black's Law Dictionary 460 (4th ed. 1951). "Custody" is a very elastic term, encompassing the mere power, legal or physical, of imprisoning or taking manual

possession, as well as actual imprisonment or physical detention. People v. Willer, 132 Ill. App. 3d 63, 68 (1985). It is possible to be in custody without even being arrested. See People v. Smith, 150 Ill. App. 3d 524, 528 (1986). "Incarceration" is defined as "[i]mprisonment; confinement in a jail or penitentiary." Black's Law Dictionary 760 (6th ed. 1990). Thus, anyone who has been incarcerated is necessarily also in custody. However, someone who is in custody has not necessarily been incarcerated. See Smith, 150 Ill. App. 3d at 528.

The distinction between custody and incarceration is important because a defendant is entitled to a credit against his fine only if he was incarcerated. Specifically, section 110--14 of the Code of Criminal Procedure of 1963 provides that:

"Any person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant." 725 ILCS 5/110--14 (West 2004).

It should be noted that section 5--8--7(b) of the Unified Code of Corrections provides that a defendant is entitled to a credit against his prison sentence for the time he spent in custody prior to the imposition of his sentence. 730 ILCS 5/5--8--7(b) (West 2004). Specifically, that section provides:

"The offender shall be given credit on the determinate sentence or maximum term and the minimum period of imprisonment for time spent in custody as a result of the offense for which the sentence was imposed, at the rate specified in Section 3--6--3 of this Code." 730 ILCS 5/5--8--7(b) (West 2004).

In its analysis, the majority confuses the requirements of these two statutes. The majority sets forth that a defendant is entitled to a credit against his fine for all days spent in custody prior to the

imposition of sentence. Slip op. at 11. In making this statement, the majority relies upon People v. McNair, 325 Ill. App. 3d 725, 726-27 (2001), People v. Smith, 258 Ill. App. 3d 261, 270 (1994), and People v. Raya, 250 Ill. App. 3d 795, 802-03 (1993). None of these cases supports the majority's statement, as all three cases dealt with whether a defendant was entitled to credit against his fine for time that he had been incarcerated. Specifically, each of those cases addressed whether a defendant was entitled to credit against his fine for time that he was incarcerated after being found guilty but before being sentenced. See McNair, 325 Ill. App. 3d at 726-27 (defendant sought credit against his fine for period of time after the trial court revoked his bond and before he was sentenced); Smith, 258 Ill. App. 3d at 267-68 (defendant who was incarcerated for 114 days between when he was found guilty and when he was sentenced was entitled to a complete credit against the $100 street-value fine imposed upon him); Raya, 250 Ill. App. 3d at 802 (defendant sought monetary credit against his fine for his 51 days of pretrial and presentence incarceration).

Later, the majority states that "[t]his court has consistently held that a defendant is entitled to a $5 credit for every full day and partial day that the defendant is held in custody following his arrest and prior to posting bond." Slip op. at 12. In support of this statement, the majority cites Smith, 258 Ill. App. 3d at 267-68, and People v. Stahr, 255 Ill. App. 3d 624, 627-28 (1994). In Smith, the reviewing court explained that "[t]he defendant was entitled to credit for the days he was in custody but did not supply bail." Smith, 258 Ill. App. 3d at 267-68. Smith relied on People v. Plante, 253 Ill. App. 3d 472, 474-75 (1993). Plante in turn relied upon the Illinois Supreme Court case of People v. Hare, 119 Ill. 2d 441, 447 (1988). As noted above, at issue in Smith was whether the defendant was entitled to a credit against his fine for the period of time that he had been incarcerated. See Smith, 258 Ill. App. 3d at 267-68. In Plante, at issue was whether the defendant

was entitled to a $45 credit against his fine for nine days spent in jail prior to trial. Plante, 253 Ill. App. 3d at 474. The State argued that he was not entitled to a credit, because he ultimately posted bail. Plante, 253 Ill. App. 3d at 474. In Hare, the Illinois Supreme Court addressed whether a defendant is entitled to the monetary credit provided by section 110--14 if he also received credit against a sentence of imprisonment for time spent incarcerated awaiting trial. Hare, 119 Ill. 2d at 444; see also People v. Hare, 144 Ill. App. 3d 279, 279-80 (1986) (noting that the defendant was seeking credit against his fine for the 23 days he had spent incarcerated prior to posting bond), aff'd, 119 Ill. 2d at 453. Thus, both Plante and Hare involved situations in which the defendant was seeking a credit against his fine for time spent incarcerated prior to posting bond or bail. Although Smith and Hare both referred to a defendant receiving a credit against his fine for time that he had spent in custody, based on the facts of those cases it is apparent that those courts were using the term "custody" as meaning "incarceration." Consequently, none of those cases supports the majority's conclusion that a defendant is also entitled to a credit against his fine for being in custody without actually being incarcerated.

Furthermore, the majority's reliance on Stahr, 255 Ill. App. 3d at 627-28, is misplaced. In Stahr, this court set forth that the defendant was entitled to a $5 credit against her fine because "any portion of a day in custody constitutes a full day for purposes of section 110--14." Stahr, 255 Ill. App. 3d at 627. In support of this proposition, the Stahr court relied on People v. Johns, 130 Ill. App. 3d 548, 549 (1984), People v. Leggans, 140 Ill. App. 3d 268, 272 (1986), and People v. Beech, 202 Ill. App. 3d 576, 580 (1990). In Johns, the defendant received credit against his fine for being incarcerated in the county jail for two days. Johns, 130 Ill. App. 3d at 548-49. In Leggans, the reviewing court determined that the defendant was entitled to a credit against his fine for those days

he spent incarcerated for failing to post bond. Leggans, 140 Ill. App. 3d at 271-72. In Beech, at issue was whether the defendant was entitled to credit for time spent in jail pursuant to section 5--8--7(b) of the Unified Code of Corrections. Beech, 202 Ill. App. 3d at 580. Thus, none of the cases Stahr relies upon supports the majority's proposition that a defendant is entitled to a monetary credit against his fine pursuant to section 110--14 of the Code of Criminal Procedure merely for time spent in custody.

As to the arguments that the defendant actually raises before this court, section 110--14 of the Code of Criminal Procedure provides that the defendant is entitled to a credit against his fine for time that he was incarcerated, not for time that was "the practical equivalent of incarceration at the jail." See 725 ILCS 5/110--14 (West 2004). Had the legislature intended for a criminal defendant to receive a credit against his fine for something less than incarceration, it would have been simple for the legislature to include language to that effect. However, the legislature did not, and this court cannot interpret the plain language of the statute in a way that the legislature did not intend. See In re Donald A.G., 221 Ill. 2d 234, 246 (2006) (explaining that in statutory interpretation, the best evidence of legislative intent is the language of the statute, and when possible, the court should interpret the language of the statute according to its plain and ordinary meaning).

Finally, there is nothing in the record to suggest that the police acted improperly to "manipulate" the amount of credit that the defendant was entitled to receive. The record reveals that the defendant was arrested shortly after 11 p.m. on July 10, 2004, and was then transported to the sheriff's office about 30 minutes later. The defendant was then held in an interview room at the sheriff's office. At 12:10 a.m. on July 11, 2004, the defendant waived his Miranda rights and agreed to answer questions. After giving a written statement, the defendant was booked and placed in a jail

cell. Although the defendant maintains that the decision of the police to interrogate him in an interview room rather than in a jail cell should be held against the police in determining how much credit he is entitled to against his fine, such an argument is without merit. The above facts demonstrate no intentional act on behalf of the police to deprive the defendant of a $5 credit against his fine. Accordingly, because the defendant was not incarcerated on July 10, 2004, this court should reject the defendant's arguments that he is entitled to a $5 credit against his fine for that day.